**UNITED STATES of America, et al., Plaintiffs,**

v.

**State of WASHINGTON, et al., Defendants.**

**Case No. 9213.**

United States District Court, W.D. Washington, at Seattle.

COMPILATION OF MAJOR POST–TRIAL SUBSTANTIVE ORDERS (January 1, 2004 through December 31, 2006)

778

See appellate decision, 573 F.3d 701.

TABLE OF CONTENTS

<u>ORDER</u> <u>PAGE</u>

Order on Pending Motions (1/16/04) 782

Order Denying Petition for Review (1/22/04) 783

Order Granting Suquamish Tribe's Motion for a Preliminary Injunction
(5/18/04) 784

Memorandum on Order Granting Suquamish Tribe's Motion for a Preliminary
Injunction (5/28/04) 784

Order on Motion for Reconsideration (6/10/04) 789

Stipulation and Order of Continuance (7/15/04) 790

Order Denying Motion for a Temporary Restraining Order (7/16/04) 796

Stipulation and Order of Dismissal (9/27/04) 797

Order Granting Suquamish Tribe's Motion for Summary Judgment re: A & K
Trust (3/21/05) 797

Order on Motion of Certain Tribes to Adopt an Interim Halibut Commercial
Fishery Management Plan (5/3/05) 797

Order on Cross—Motion for Summary Judgment (7/20/05),
(393 F.S.2d 1089) See Appendix

Order on Pending Motions (9/6/05) 798

Order on Motion for Reconsideration (10/21/05) 800

Order on Motion to Dismiss (10/27/05) 802

Order on Motion to Compel (12/19/05) 806

Decision (12/30/05) 809

Order on Motions for Clarification and for Reconsideration (1/23/06) 814

Order on Motion for Reconsideration (1/26/06) 815

Order on Motion for Reconsideration (3/17/06) 818

Order on Motion for Clarification (3/17/06) 818

Order on Motion for a Protective Order (8/15/06) 818

Order on Motion to Compel (8/15/06) 820

Order on Pending Motions to Strike Expert Witnesses (10/10/06) 821

Order on Motion to Dismiss (11/21/06) 822

Order on Pending Motions (12/4/06) 827

COMPILATION OF MAJOR POST–
TRIAL SUBSTANTIVE ORDERS
(Through December 31, 2006)
ORDER ON PENDING MOTIONS

Subproceeding No. 89–3

(January 16, 2004)

RICARDO S. MARTINEZ, United States Magistrate Judge.

Now before the Court are cross-motions for amendment and for clarification of the previous Order on Motion for Reconsideration. The Tulalip Tribes, Swinomish Tribal Community, and Upper Skagit Indian Tribe ("Tribes") have joined in a motion to alter or amend the judgment. Dkt. # 17608. The Suquamish Tribe, in turn, has moved for clarification of the same motion. Dkt. # 17617. Having considered the motions and all memoranda filed in support and in opposition, the Court does now find and ORDER:

(1) The Tribes' Motion to Alter or Amend the Judgment.

The parties are familiar with the facts and issues related to the current dispute. The Tribes seek amendment of the language in the Order on Motion for Reconsideration, striking footnote 3 in the Order on Motion for a Temporary Restraining Order (TRO) only to the extent that it could be considered to address primary rights. The Tribes ask that the footnote be stricken in its entirety; they argue that the footnote amounts to a *sua sponte* determination by the Court of the extent of the Suquamish Tribe's usual and accustomed fishing areas, thus exceeding the jurisdictional scope of the TRO proceedings. However, the Tribes put in issue the scope of the Suquamish Tribe's usual and accustomed fishing areas by asserting that scope as one basis for the requested TRO:

Suquamish has violated the Implementation Order, State/Tribal Harvest Plan, and intertribal harvest management agreements for Region 2E by issuing regulations without participating in management discussions, executing applicable management plans, and otherwise failing to follow the proper procedures for opening a fishery. Suquamish's actions threaten to disturb management planning, and disrupt the fishery and the Tribes' winter crab harvest in Region 2E. Suquamish has also violated the *Stipulation Re: Presentation of Tribal Usual and Accustomed Fishing Places* ("Shellfish Stipulation") **by seeking to expand the status quo established for shellfishing rights outside the scope of the usual and accustomed fishing grounds and stations ("U & A") previously determined in *United States v. Washington* and stipulated agreements.**

Motion for Temporary Restraining Order, p 2 (emphasis added). In support of their "status quo" argument, the Tribes presented evidence that the Suquamish had never fished in Region 2E; this evidence was disputed by the Suquamish. It was thus necessary for the Court, in ruling on the TRO, to determine whether Region 2E is within the scope of the Suquamish Tribe's U & A as it was previously determined by Judge Boldt or, if relevant, as modified by subsequent stipulations or determinations. *United States v. Washington,* 459 F.Supp. 1020, 1049 (W.D.Wash 1978). There was no evidence before the Court which would allow it to conclude that Region 2E is not within the Suquamish U & A as defined by

Judge Boldt, nor any evidence that Judge Boldt's determination has been modified or limited by subsequent proceedings or agreements. Therefore, the Court ruled that the Tribes had not met the "threat of irreparable harm" or "probability of success on the merits" standards for obtaining a TRO. Dkt. # 17563. Such ruling does not amount to an "adjudication" of the Suquamish Tribe's U & A; as the Tribes themselves asserted in their original Motion for a TRO, that was "previously determined in *United States v. Washington* and stipulated agreements."

Accordingly, the Tribes' Motion to Alter or Amend the Judgment is GRANTED IN PART. Footnote 3 of the Order on Motion for a Temporary Restraining Order is hereby STRICKEN, to be replaced with language as follows:

> FN 3: The Court notes that "[t]he usual and accustomed fishing places of the Suquamish Tribe include the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into western side of this portion of Puget Sound and also Hood Canal," *United States v. Washington,* 459 F.Supp. 1020, 1049 (W.D.Wash. 1978). No evidence has been presented to the Court which would place Region 2E outside of this area.

(2) The Suquamish Tribe's Motion for Clarification.

In a cross-motion, the Suquamish Tribe moves the Court to allow footnote 3 to stand, but asks that the Court clarify the discussion regarding "status quo" in the Order on Motion for Reconsideration, As set forth above, this motion is GRANTED IN PART with respect to footnote 3. The Court declines to further discuss the "status quo" and as to that request the motion is DENIED.

(3) Clarification of the upcoming status conference.

The Tribes have also asked the Court to clarify the purpose of the upcoming status conference in this matter. The Court has requested the conference for the purpose of establishing procedures for resolving further disputes under Paragraph 9.2 of the Implementation Plan. The conference shall be limited to procedural issues. Accordingly, the Tribes' Motion for Clarification of this matter is GRANTED.

## ORDER DENYING PETITION FOR REVIEW

Subproceeding No. 89–3

(January 22, 2004)

ROBERT S. LASNIK, District Judge.

This matter comes before the Court on the petition of the Tulalip Tribes, Swinomish Indian Tribal Community, and Upper Skagit Indian Tribe for review of United States Magistrate Judge Ricardo S. Martinez' discussion of the Suquamish Tribe's usual and accustomed fishing places in footnote 3 of his Order on Motion for a Temporary Restraining Order (Dkt. # 17563) and in the related Order on Motion for Reconsideration (Dkt. # 17601). The Court has authority to hear this petition for review pursuant to the Stipulation and Order Amending Shellfish Implementation Plan, Attachment A, ¶ 9.1.4 (Dkt. # 17340).

Shortly before filing this petition for review, the Tribes filed a motion to alter or amend the judgment before Judge Martinez. After considering the Tribes' arguments and the cross-motion of the Suquamish Tribe, Judge Martinez revised footnote 3 to clarify that his ruling does not amount to an adjudication of the Suquamish Tribe's usual and accustomed

fishing places insofar as that determination had already been made in *United States v. Washington*, 459 F.Supp. 1020, 1049 (W.D.Wash.1978). See Order on Pending Motions (Dkt. # 17629).

Having reviewed the record that was before Judge Martinez and the arguments of the parties, the Court finds that revised footnote 3 accurately quotes pre-existing judicial determinations and that the information was appropriately included in the order because it was relevant to Judge Martinez' denial of a temporary restraining order. Revised footnote 3 neither expands nor limits the geographic scope of the Suquamish Tribe's usual and accustomed fishing grounds: it simply identifies one of the difficulties the Tribes faced when attempting to enforce the "status quo." The petition for review is DENTED.

## ORDER GRANTING SUQUAMISH TRIBE'S MOTION FOR A PRELIMINARY INJUNCTION

Subproceeding No. 89–3–03

(May 18, 2004)

RICARDO S. MARTINEZ, United States Magistrate Judge.

This matter is before the Court for consideration of a Motion for Preliminary Injunction, under authority conferred by the Stipulation and Order Amending Shellfish Implementation Plan ¶ 9.1 (April 8, 2002). The Suquamish Tribe seeks a court Order enjoining the A & K Trust ("Trust") or its designee from harvesting clams from property leased by the Trust at Erlands Point in Kitsap County, Washington. The court heard oral argument on May 14, 2004, and accepted a supplemental memorandum on behalf of Puget Sound area shellfish growers, and a supplemental reply from the Tribe, Having fully considered the matter, the court now finds and rules as follows:

(1) The Suquamish Tribe's motion for a preliminary injunction is GRANTED.

(2) The Trust (or anyone acting on its behalf) shall immediately cease the harvest of clams from the Erlands Point property.

(3) The Trust shall permit the Tribe, upon 24 hours notice, to survey the remaining clam populations on the Erlands Point property.

(4) The Trust shall document, by species and date, the quantities (if any) of shellfish that have been harvested from the Erlands Point property, and the quantities and value of each species of shellfish (if any) that have been sold from such harvest. The Trust shall provide this documentation to the Tribe and to this Court within seven days of the date of this Order.

(5) Neither the Trust nor anyone acting in its behalf may resume harvesting of clams on the Erlands Point property until further Order of this Court. The Trust may move for such Order after satisfying the Court that sections (3) and (4) above have been satisfied.

(6) In light of counsel's statement at the hearing that no harvest of clams is currently underway, no security under F.R.Civ. Proc. 65(c) is deemed necessary.

(7) A written memorandum on this decision shall follow within ten days, pursuant to § 9.2.5 of the Revised Shellfish Implementation Plan.

## MEMORANDUM ON ORDER GRANTING SUQUAMISH TRIBE'S MOTION FOR A PRELIMINARY INJUNCTION

Subproceeding No. 89–3–03

(May 28, 2004)

On May 18, 2004, the court granted the Suquamish Tribe's motion for a prelim-

inary injunction, enjoining the A & K Trust from harvesting clams from property at Erlands Point until further order of the court. The court has jurisdiction to resolve this dispute under authority conferred by the Stipulation and Order Amending Shellfish Implementation Plan ¶ 9.1 (April 8, 2002) ("Implementation Plan"). Pursuant to § 9.2.5 of the Implementation Plan, the court now enters this memorandum stating reasons for granting the injunction.

(1) On April 28, 2004, the Suquamish Tribe filed a request for dispute resolution regarding the Tribe's treaty right to harvest shellfish from tidelands at Erlands Point in Dyes Inlet, Kitsap County. The property is currently under lease to the A & K Trust ("the Trust"). Together with the request for dispute resolution, the Tribe filed a motion for a preliminary injunction to enjoin the Trust, or anyone acting on its behalf, from harvesting shellfish from Erlands Point tidelands until the Tribe has had an opportunity to survey and, if appropriate, harvest its treaty share. The Trust opposes such survey and harvest on the grounds that the shellfish beds at Erlands Point are "staked and cultivated," At the May 14, 2004 hearing on the motion, the Tribe's request was narrowed to address clams at Erlands Point, not all shellfish. The findings and conclusions herein are thus specifically limited to clams.

(2) The dispute herein arises over the application of the so-called "Shellfish Proviso" in the Stevens Treaties. In 1855, the United States negotiated five Treaties with the Tribes of western Washington, at that time a territory. These treaties reserved to the Tribes the "right of taking fish, at all usual and accustomed grounds and stations ... in common with all citizens of the Territory." *United States, et al. v. Washington, et al.,* 157 F.3d 630, 637 (9th Cir. 1998). With respect to shellfish, however, this right was limited by the Shellfish Proviso, which stated, *"Provided, however,* That they shall not take shellfish from any beds staked or cultivated by citizens." *Id.* at 638. The parties are familiar with the extensive litigation spawned by the Treaty language, and with the principles of Treaty construction which were applied by the court in resolving the issues, The cases will thus be reviewed only to the extent necessary to resolve the current dispute, which evolves from the parties' differing interpretations of the term "staked and cultivated."

(3) This court addressed the Shellfish Proviso in a series of cases beginning in 1994, In *Shellfish I,*[1] the court "interpreted the Treaties to award fifty percent of the shellfish harvest in Washington waters to the Tribes", *Id.* at 641. That award, however, was subject to the limitations of the Shellfish Proviso. First, the court concluded that the Shellfish Proviso did not apply at all to natural or native shellfish beds. *Shellfish I,* 873 F.Supp. at 1429, The court then interpreted the term "staked and cultivated by citizens" to describe "artificial shellfish beds created by private citizens," including "the intervenor growers' farms." *Id.* at 1441. The court found that such artificial beds are not subject to Tribal treaty fishing, "except to the extent that natural clam beds may be subadjacent to the staked or cultivated shellfish beds." *Id.* The court then held a six-day trial, the purpose of which was to receive evidence from which the parties could develop a plan to implement *Shellfish I.*

(4) The implementation plan was incor-

---

1. 873 F.Supp. 1422 (W.D.Wa.1994).

porated into *Shellfish II*.[2] The court defined a "natural bed" (that is, one which under *Shellfish I* could not be staked and cultivated) as one "which is capable of sustaining a yield of shellfish that will support a commercial livelihood." 898 F.Supp. at 1460–61. The determination of that threshold amount was left to procedures set up in the Implementation Plan. *Id.* The court noted that all parties agreed that "any shellfish beds created exclusively by the Growers' efforts—'by scratch', as it were" are clearly "staked and cultivated" within the meaning of the Shellfish Proviso. *Id.* at 1462. The court then applied equitable principles to include within the Shellfish Proviso (and exclude from Tribal harvest) natural beds which had been enhanced by the Growers' efforts, Such as planting, seeding, or netting, and predator control. *Id.* at 1462. This portion of *Shellfish II* was reversed by the Ninth Circuit. Noting the long-established principle that the terms of a treaty must be strictly construed in favor of the Tribes' fishing rights, the appeals court ruled that the district court erred in using its equitable powers to modify the terms of the Treaties to exclude Growers' beds from Tribal harvest. 157 F.3d at 642, 649–50.

(5) The district court in *Shellfish II* improperly broadened the definition of "cultivated" shellfish beds to include so-called "de facto artificial beds", meaning natural shellfish beds that have been enhanced by human means. *Id.* at 650. Ruling that the Tribes could not be excluded from their ancient fisheries, but merely from taking an unfair share, the appeals court devised the following allocation scheme: (1) a shellfish bed on Grower's property that existed "solely by virtue of the natural propagation of the species"—a "natural bed"—is subject to "a full fifty percent harvest allocation." *Id.* at 652. (2) Where

a Grower has enhanced the natural production of a bed through cultivation efforts, the Tribal share is "fifty percent of the pre-enhanced sustainable shellfish production". *Id.* at 653. For such enhanced natural beds, the burden is on the Growers to "demonstrate what portion of their harvest is due to their labor, as opposed to what portion would exist absent the Growers' enhancement." *Id.* Only that portion which is proven to be due to the Grower's efforts is excluded from Tribal harvest. *Id.* at 653. (3) Artificial beds, defined as "Grower beds that did not support a sustainable commercial density of shellfish prior to cultivation" are not subject to Tribal harvest at all. *Id.* The Ninth Circuit court remanded the matter for further proceedings consistent with the opinion. Pursuant to that remand, the court on April 5, 2002, approved the parties' stipulation which created the Revised Shellfish Implementation Plan ("Implementation Plan").

(6) The Suquamish Tribe initiated the dispute resolution process pursuant to § 9 of the Implementation Plan after the Tribe's Treaty right to survey and harvest shellfish at Erlands Point was challenged by the Trust. Vivianne Barry, Shellfish Biologist for the Suquamish Tribe, gave notice on March 1, 2004, of the Tribe's intent to survey and harvest the shellfish population at Erlands Point, Declaration of Paul Williams, attachment E. On March 7, 2004, the Tribe received the following response from Tal Price, Trustee of the A & K Trust:

Dear Ms. Barry:

For your information, the tidelands referred to in your letter of 1 March 2004 (which I received in my Post office box on 4 March) are part of a licensed Aquatic (Shellfish) Farm (farms) and

2. 898 F.Supp. 1453 (W.D.Wa.1995).

therefore are covered by the "staked and cultivated" beds provisions of *U.S. v. Washington, C70–9213.* I would specifically direct your attention to subproceeding No. 89–3 and subsequent orders.

As we have previously informed the Suquamish Tribe, we will <u>challenge</u> any attempts to assert treaty rights over these shellfish beds and <u>require</u> the Suquamish Tribe <u>to comply with the provision</u> of subproceeding 89–3 and subsequent orders.

As you should know, you have no right to "inspect or survey" these shellfish beds absent a resolution of the "dispute resolution provisions of the Implementation Plan."

 Sincerely,

 Tal Price, Trustee

 A & K Trust

Declaration of Paul Williams, attachment F. The Tribe then filed this request for dispute resolution, together with a motion for a preliminary injunction to prevent the Trust from harvesting any more clams before the Tribe's Treaty share could be determined.

(7) At the hearing on the Tribe's motion, the Trust argued that the shellfish beds at Erlands Point are staked and cultivated by a licensed grower, and that therefore the Tribe should have proceeded under § 6 of the Implementation Plan, rather than treating the Trust as a recreational property owner under § 7. The Trust also argued that the § 6.1 procedures for notice and determination of the Tribe's share of commercial shellfish beds cannot be initiated at this time, because "Exhibit A" has not been completed. Exhibit A is described in the Implementation Plan as "a chart showing the minimum density of commercial shellfish species needed to establish the existence of a natural bed …" Implementation Plan § 6. The Plan con-

templated that Exhibit A would be completed within six months of April 8, 2002. However, two years later it is still not complete, and the latest stipulation of the parties in Subproceeding 89–3–01 (the "density dispute") requests a trial date after October of 2005—more than a year away, Dkt. # 17637. However, the Implementation Plan itself provides for the invocation of the dispute resolution process for "any disagreements remaining after six months [from April 8, 2002]" regarding, among other matters, "the natural bed threshold for any particular species, region and time interval …" Implementation Plan, § 6. Therefore this dispute is properly before the court.

(8) From the record before the court, it appears that the Tribe properly proceeded under § 7 of the Implementation Plan. Although Mr. Price asserts that the Trust is a "licensed shellfish grower", there is no evidence before the court to support that assertion with respect to the clam beds at Erlands Point. Mr. Price did not present, by testimony or by affidavit, any evidence specific to cultivation of clams at Erlands Point; his declaration regarding "seeding and cultching" with bags of oyster shells is not directed to any specific area and uses terms relevant to oyster farming, not clam cultivation. Nor did he present any evidence that either he or the A & K Trust possesses a license to cultivate clams at this site. There are several types of licenses and certificates issued to commercial shellfish growers by the State of Washington, The Department of Health issues site-specific certificates of approval for shellfish harvests pursuant to RCW 69.30.050. The Department of Health also issues annual shellfish operation licenses, required of "any person who possesses a commercial quantity of shellfish or any quantity of shellfish for sale for human consumption." WAC 246-282-014; 246-

282–990. Both are required of "persons who conduct shellfish operations." WAC 246–282–012. There is also a requirement for registration as an aquatic farm with the Department of Fish and Wildlife prior to beginning cultivation activities. WAC 220–76–020(1). Such registration must be renewed annually, and is not transferable. WAC 220–76–010(2), (3). While it was not possible for the Trust to obtain a harvest certificate prior to December of 2003, due to the pollution status of Dyes Inlet, there was no impediment to registration as an aquatic farm.

Indeed, the one document presented by the Trust to support its claim of being a licensed grower of clams at Erlands Point is an Aquatic Farm Registration Certificate purportedly issued to "A & K Trust" and dated January 31, 1996.[3] Declaration of Tal Price, Exhibit C. The Tribe has produced a copy of the same document obtained from the Washington Department of Fish and Wildlife; it shows that the copy submitted by the Trust was altered to indicate only the Trust as holder of the registration, while in fact it was issued jointly to the A & K Trust and the Lindsay Beach Shellfish Company, owned by Thomas Pepper. Declaration of Cory Albright, attachment 2(a), (b). There is no evidence of renewal by either the Trust, Mr. Price, the Lindsay Beach Shellfish Company, or Thomas Pepper. This document does not establish that the Trust was a licensed grower of clams at Erlands Point as of the effective date of the Implementation Plan, and it will not be considered further. Nowhere in the file is a copy of a shellfish operation license issued to the Trust, as described in WAC 246–282–014 and 246–282–990. The only harvest site approval certificate for Erlands Point was issued to Chuck Dahman of Clam Acres on December 3, 2003, well after the effective date of the Implementation Plan. Declaration of Paul Williams, attachment B.

As to the Intervenors' argument that a Grower is anyone who cultivates shellfish, regardless of whether he or she possesses a license to do so, or registers as an aquatic farm, the court notes that this "activity based" argument was rejected by the court in Shellfish I. The Growers offered in those proceedings a definition of "staked and cultivated beds" that included any bed that was "in some fashion improved by human labor." 873 F.Supp. at 1431. The Ninth Circuit affirmed the district court's rejection of the Growers' proffered definition, finding the Growers' interpretation "totally inconsistent with the 'United States' avowed intention to preserve for the Indians their ancient fisheries.'" 157 F.3d at 648. Further, Shellfish II specifically limited the application of the Implementation Plan procedures to "existing beds on property owned or leased by Growers licensed by the State of Washington." 898 F.Supp. at 1461. While the Ninth Circuit reversed some aspects of Shellfish II, as noted above in ¶ 4, it did not alter the quoted limitation. 157 F.3d at 650.

This dispute resolution proceeding is not the place to enlarge the scope of the term "Grower" beyond that already defined by the court. Indeed, the Implementation Plan itself explicitly states that the "parties are bound by the definitions prescribed by the Court" in Shellfish I, Shellfish II, and the decision of the Ninth Circuit. Implementation Plan, § 6. That means that § 6 can only apply to beds on property owned or leased by a Grower licensed by the State of Washington. There are strong public policy reasons For maintaining the requirement for a license; foremost among these is protection

---

**3.** This date is after the date the parties agree was the effective date of the Implementation Plan, originally set forth in Shellfish II August 28, 1995.

of public health. Further, the courts' application of the Shellfish Proviso is only meaningful if the Tribes have notice of its reach—in other words, if they can determine with some certainty who is a Grower and which beds are "staked and cultivated" as that term has been interpreted by the court and the parties in the Implementation Plan. It would impermissibly erode the carefully crafted provisions of the Implementation Plan if the Trust could claim Grower status on the basis of vague and unsupported allegations of unlicensed and unregistered cultivation activities.

Therefore, the court finds that there is no evidence to establish that, as of the date of the Implementation Plan, the clam beds at Erlands Point qualified as "existing beds on property owned or leased by Growers licensed by the State of Washington," subject to the restrictions and procedures set forth in § 6.1 of the Implementation Plan. Accordingly, the Tribe may properly proceed under § 7 of the Implementation Plan in its request to survey and, if appropriate, harvest clams from Erlands Point. This ruling is limited to the unique and specific circumstances presented in this dispute.

(9) In order to obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits together with the possibility of irreparable harm, or (2) that serious questions are raised, and the balance of hardships tips sharply in favor of the moving party. *Textile Unlimited, Inc. v. A. BMH Co., Inc.*, 240 F.3d 781, 786 (2001). Here, the Tribe has demonstrated a strong likelihood of success on the merits in this dispute. It has also shown that continued harvest of clams by the Trust in defiance of the Tribe's Treaty rights poses a threat of irreparable harm not only to the Tribe, but to the principles of treaty construction embodied in this case and the Implementation Plan: the Shellfish Proviso is an exception to the Tribes' broad fishing rights, and as such must be strictly construed, 157 F.3d at 642, *citing* Sutherland on Statutory Construction, § 20.22 at 110 (5th ed.1992).

(10) Under the injunction issued on May 18, 2004, neither the Trust nor its designee Clam Acres may harvest any more clams at Erlands Point until further order of the court. Such order will issue upon a showing by the Trust that it has negotiated in good faith with the Tribe to ensure the proper exercise of the Tribe's Treaty rights. Such negotiation shall take place according to § 7 of the Implementation Plan.

(11) The Trust moved at the May 14 hearing to strike the Tribe's reply memorandum as overlength. This motion is DENIED, because the brief is not overlength. Local Rule CR 7(e)(3).

### ORDER ON MOTION FOR RECONSIDERATION

#### Subproceeding No. 89–3–03

#### (June 10, 2004)

The Court, having considered the A & K Trust's Motion for Reconsideration, and the balance of the file, does now find and Order:

(1) Motions for reconsideration are disfavored, and are granted only with a showing of manifest error in the prior ruling, or a showing of new facts or legal authority which could not with reasonable diligence have been brought to the Court's attention earlier. Local Rule CR 7(h)(1). The Trust has shown neither.

(2) Manifest error.

The Trust argues that the Court's limitation of Section 6 of the Implementation Plan to Growers licensed by the State of Washington has no basis in law. That is not so. The Ninth Circuit Court of Appeals reversed the district court's application of equitable principles to limit Tribal

harvest from "existing beds on property owned or leased by Growers licensed by the State of Washington." *United States, et al. v. State of Washington, et al.,* 157 F.3d 630, 649 (9th Cir.1998). While it thereby altered the treatment of such beds under the Implementation Plan, it did not alter the district court's actual definition of those beds. Section 6 of the Implementation Plan, as noted in the prior Order, expressly maintains the "definitions prescribed by the Court" in the various shellfish cases. Such definitions are an essential component of the Implementation Plan. The Trust has pointed to no other possible definition, in any of the relevant cases, than that set forth above.

(3) New Facts.

In support of its claim to be a Grower licensed by the State of Washington, the Trust has presented oyster transfer permits issued to Tal Price in 1993 and 1995, for the transfer of oysters to Chico Bay. Even if the Court were to accept these permits as "new facts" which could not have been brought earlier with reasonable diligence, the Court declines to accept them as proof of the Trust's status as a Grower licensed by the State of Washington to cultivate the clams at Erlands Point which are the subject of this dispute.

(4) Accordingly, the Trust's Motion for Reconsideration is DENIED. The Court renews the prior caution that the findings and rulings herein are limited to the unique and specific circumstances of this dispute, and extend only to the clam beds on Trust property at Erlands Point.

## STIPULATION AND ORDER OF CONTINUANCE

Subproceeding 03–1

(July 15, 2004)

### INTRODUCTION

This stipulation to stay the proceeding is entered into between the United States, Hoh Tribe, and State of Washington. As outlined below and explained in the parties' July 1, 2004 Joint Progress Report, the Washington Department of Fish and Wildlife and the Hoh Tribe have tentatively reached agreement on a framework management plan for Hoh River Winter Steelhead for the 2004–2005 to 2006–2007 seasons. However, the plan is contingent on the Washington Fish and Wildlife Commission ("Commission") adopting a rule in August 2004 allowing some retention of wild steelhead. If the Commission adopts such a rule, the parties agree to stipulate to dismissing this subproceeding, without prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii) alter September 1, 2004. However, if the Commission bans retention of all steelhead, such an event will trigger the need to renegotiate the terms of the tentative framework agreement.

In the mean time, the parties have reached an agreement regarding the 2004–2005 Hoh River Winter Steelhead fishery. This season's agreement contemplates two possible scenarios: the Commission allowing some nontreaty retention of wild steelhead and the Commission prohibiting nontreaty retention of wild steelhead. The parties have agreed to possible fishing schedules, taking into consideration both possibilities.

Because the parties have reached an agreement regarding this season's fishery, there will be time to renegotiate the framework agreement should it be necessary to do so. In the event the Commission prohibits retention of wild steelhead, the parties will endeavor to work cooperatively and in good faith to reach a final agreement by July 1, 2005. If no framework agreement has been reached by that date, the stay of this proceeding would end

and a litigation schedule as described below would resume.

## HOH INDIAN TRIBE WASHINGTON DEPARTMENT OF FISH AND WILDLIFE FRAMEWORK MANAGEMENT PLAN FOR HOH RIVER WINTER STEELHEAD (2004–2005 THROUGH 2006–2007 SEASONS)

### I. Introduction

The Hoh Indian Tribe (Tribe) and the Washington Department of Fish and Wildlife (Department) have overlapping interests and jurisdictions relative to the management of Hoh River winter steelhead that creates the need for a co-management relationship. The Tribe and the Department recognize that it is mutually beneficial to jointly develop management and harvest strategics designed to meet tribal and state fishery objectives.

The Tribe and the Department seek to promote resource protection and annual fishery stability. The objective of this plan is to establish fisheries management principles by setting goals and objectives by which the Department and the Tribe will address conservation, harvest management, allocation, and enhancement issues. It also allows the parties to put aside potential points of disagreement to the extent possible so that they can focus their efforts on improving future steelhead management in the Hoh River system. Such issues may include: the calculation of shares of wild and hatchery steelhead; foregone opportunity; non-harvest impacts of each fishery, and escapement management.

An important priority of this plan and future efforts is to restore and maintain the diversity and long-term productivity of Hoh River wild winter steelhead, In a manner consistent with this primary goal, the Hoh Tribe and the Department will seek to develop and manage fisheries to achieve cultural, economic, and recreational fishing benefits for the citizens of Washington State and members of the Hoh Tribe.

The plan is intended to provide a level of certainty and stability for state and tribal fisheries. The plan provides for tribal commercial, ceremonial and subsistence, and non-Indian recreational opportunity for catch and keep, and catch and release fisheries.

Finally, the plan contains objectives for monitoring, evaluation, and enforcement.

### 1. Disclaimer

The Parties do not claim that the provisions of this agreement necessarily address or strictly meet any of their respective interpretations of the law or the application of legal principles which may otherwise be applied to the specific outstanding issues previously identified. The Parties' objective in this agreement is to provide a three-year management framework, make progress on the technical issues raised and find information and common ground to reach future agreements.

The applicable federal court orders under *U.S. v. Washington* shall apply to any Party's activities not expressly provided for in this management plan, annual agreements, or any potential amendments to annual agreements or this plan. No Party waives any rights, claims, appeals, or arguments by entering into this management plan.

### 2. Term

This harvest management plan is effective when signed by both the Tribe and the Department. The term of this plan

is from the date of execution until May 1, 2007, or until superseded by a subsequent management plan signed by both Parties.

### 3. Escapement Goal

The annual escapement goal for wild steelhead entering the Hoh River is 2,400 wild adults. The Parties agree to manage their fisheries to meet the wild spawning escapement goal.

Annual total allowable wild harvest equals the pre-season wild run size minus 2,400. There is no escapement goal for hatchery fish introduced into the Hoh River for harvest augmentation. Annual total allowable hatchery harvest equals the pre-season hatchery run size.

### 4. Management Objectives

The Tribe and the Department will seek to develop and manage their steelhead fisheries to achieve cultural, economic, and recreational benefits consistent with the following:

A. Maintain self-sustaining wild steelhead and their habitats at a healthy level.

B. Provide adequate enforcement of regulations that are designed to protect and conserve wild steelhead. This includes habitat protection and compliance with seasons, bag limits, catch reporting requirements, fishing area and gear restriction's, and release of wild fish, as required.

C. Non-treaty fishery goals and objectives:

　a. Provide full season fisheries from December 1 to April 15 (including ONP waters)

　b. Provide a mix of harvest and catch and release opportunities

　c. Provide quality fishing opportunity by having enough wild fish present to provide a meaningful fishery

D. Treaty fishery goals and objectives:

　a. Provide a minimum of a two day per week fishery from week 49—week 14

　b. Accommodate Ceremonial and Subsistence needs

　c. Adjust fishing schedule if extremely high river flow conditions cause the river to be completely unfishable for at least one full day

E. Monitor and evaluate the health and diversity of wild steelhead and provide active effort and support for regulations to protect and fully recover habitat.

### 5. Accounting for Each Party's Fishery Related Mortalities

The parties agree to work together during the period of this agreement to evaluate fishery related mortalities for both treaty and non-treaty fisheries and how related estimates should be used in management. The primary categories that the Parties agree to assess are:

A. Non-landed mortalities associated with catch and release regulations, including:

- The number of wild steelhead encountered and released, estimated through a Department administered, two-year creel census begun in 2003–2004; and

- The associated number of released fish mortalities

B. Mortalities associated with encounters with treaty and non-treaty fishing gear that are not subject to handling by fishers (e.g., those fish that drop off or out of gear); and

C. Mortalities associated with predation by marine mammals

The Parties also agree to convene a technical work group to evaluate the

interaction of the recreational fishery with spawning wild steelhead and potential associated mortalities that occur upstream of Morgan's Crossing from April 1 through April 15. Following this technical review WDFW and Tribal policy representatives will meet to discuss the results and decide on an appropriate response, if any. These evaluations and discussions will be completed in 2004 no later than the respective technical and policy dates specified in Sections 8.E. and 8.F. below.

## 6. Hatchery Augmentation

The Tribe and the Department agree that the annual hatchery augmentation goal will be to release 100,000 smolts below the Highway 101 Bridge. The smolts released will be from the Cook Creek stock or as otherwise agreed. All smolts released will be marked with an adipose fin clip. There are no egg-take requirements for the returning adult hatchery steelhead.

## 7. Data Base Maintenance

The Parties agree to maintain a joint database for computation of annual run sizes for both hatchery and wild steelhead runs. These data will be used by the Parties to make pre-season forecasts of run strength, and harvest rates to guide annual harvest plans. The components of this database will be:

Wild Run Size = tribal catch + sport catch + escapement Hatchery Run Size = tribal catch + sport catch + escapement

The Parties also agree to seek the means to address priority run size, escapement and harvest impact assessment needs in order to maintain a complete joint database.

## 8. Annual Harvest Management Procedures and Dates

A. The annual harvest management procedures in Sections 8.B. and 8.C. and the associated harvest rates in Table 1 are contingent on the Fish and Wildlife Commission allowing retention of wild steelhead consistent with the management objectives contained within this plan. If retention of wild steelhead by the nontreaty fishery is prohibited, the Parties agree to revisit the provisions in Sections 8.B. and 8.C.

B. Allowable wild steelhead mortality rates and associated fisheries will be based on a sliding scale dependent on forecasted wild steelhead abundance as shown in Table 1. Each party will design its fishery to not exceed the mortality rates shown in the "Wild Treaty HR" and the "Wild Non–Treaty HR" columns. Wild harvest rates in Table 1 will apply to run sizes through 4,800. Wild harvest sharing at run sizes above 4,800 will be determined by agreement through the annual management planning process.

C. Since the estimated sport fishery harvest rate is only based on one year, the 2004–2005 season will have similar regulations as 2003–2004, including provisions for wild fish retention, and be assumed to equal a 15% wild fish exploitation rate. Subsequent seasons' regulations may be changed, as necessary, if available estimates of recreational harvest rates warrant it. In addition, throughout the duration of this plan, recreational regulations for hatchery steelhead may be liberalized through week # 6.

D. Tribal fishing schedules will be modeled using the rolling average of the wild harvest rates observed for the four most recent completed sea-

sons. The tribe will identify a block of fish for ceremonial and subsistence needs that will be included in the tribal allowable exploitation rate. Adjustments may be made in the tribal commercial fishery schedule if extremely high river flow conditions cause the river to be completely unfishable for at least one full day. These river flow conditions can occur several times during the winter fishing seasons. In most cases, make-up fishing days will be during the same week as the day lost. However, in the rare instances when river height conditions prevent fishing days from being made-up in the same week, the days will be added in subsequent weeks, provided the resulting harvest rate docs not exceed the rate identified in Table 1 and the total number of fishing days in a week does not exceed the normally scheduled days plus one. The Tribe will notify the Department by telephone of its intent to make up a lost fishing day on the working day prior to an extension of the weekly period.

E. Technical information/agreement will be developed by Tribal and Department staff by November 10 each year and submitted to the policy representatives along with a written summary of any unresolved issues to be decided by the parties' policy representatives. Technical information for the preseason ran size forecasts for the coming season will be jointly agreed upon and the estimated spawning escapements for the previous winter steelhead season will be jointly agreed upon and this data will be added to the data base. Fishery impact models will be updated to include the most recent year's catch and harvest rate data in order to project expected fishery impacts of proposed fishing schedules.

F. Policy representatives of the Hoh Tribe and the Department will meet no later than November 20 each year to reach agreement on each party's fisheries for the coming season. The agreement shall be memorialized in an annual management plan signed by each party. If agreement is not reached at the first meeting, a second meeting of the policy representatives will occur no later than December 1 to resolve any outstanding issues. Neither party will authorize fishing beyond statistical week # 6, unless an agreement is reached or the disputed matters are resolved pursuant to section 9. Absent an agreement, the Hoh Tribe will not authorize a fishery that exceeds three days per week through week # 6, and wild harvest rates for treaty and non-treaty fisheries will be limited to those rates defined in Table 1.

G. In the event Sections 8B and Section 8C are re-negotiated as provided in Section 8.A., and if the Parties fail to reach agreement on revisions to these sections, the Tribe shall be allowed to conduct its 2004–05 fishery for two days per week through week # 12 and one day per week for weeks # 13 and # 14, or to fish to the wild treaty harvest rates allowed in Table 1, at the Tribe's option. The non-treaty fishery shall be allowed to fish according to provisions contained in the 2004/2005 WDFW Sport Fishing Rules pamphlet, and recreational regulations for hatchery steelhead may be liberalized through week # 6.

## 9. Dispute Resolution

The Parties agree that disputes arising under this management plan will first be addressed cooperatively by policy repre-

sentatives of both parties in a face-to-face meeting to avoid the need to resort to judicial or other third party dispute resolution mechanisms. The parties expect that this cooperative approach will resolve a majority of the issues. Absent resolution by the policy representatives, the dispute resolution process prescribed under *U.S. v. Washington* will be employed as follows unless otherwise agreed in writing. Resolution of all technical issues associated with implementing the plan will utilize the Fisheries Advisory Board. Any unresolved policy disputes will be resolved pursuant to "Order Modifying Paragraph 25 of Permanent Injunction,"

If renegotiation of Sections 8.B. and 8.C. is necessary, disputes arising in such context are not subject to this provision. However, if a new agreement is reached through renegotiation, any questions regarding its implementation would be resolved under this section.

## 10. Changes to the Plan

Changes to this framework plan must be made in writing and signed by policy representatives of both Parties.

Table 1—Hoh River Winter Wild Steelhead Harvest Schedule and Expected Escapements

| Wild Run Size 2/ | Maximum Total Allowable Wild IIR 2/ | Wild Treaty HR 2/ | Wild Non–Treaty HR 2/ | Expected Wild Spawning Escapement |
|---|---|---|---|---|
| 1600 | 0.100 | 0.090 | 0.010 | 1440 |
| 1800 | 0.100 | 0.090 | 0.010 | 1620 |
| 2000 | 0.100 | 0.090 | 0.010 | 1800 |
| 2200 | 0.100 | 0.090 | 0.010 | 1980 |
| 2400 | 0.100 | 0.090 | 0.010 | 2160 |
| 2600 | 0.100 | 0.090 | 0.010 | 2340 |
| 2700 | 0.111 | 0.090 | 0.021 | 2400 |
| 2800 | 0.143 | 0.090 | 0.053 | 2400 |
| 2900 | 0.172 | 0.090 | 0.082 | 2401 |
| 3000 | 0.200 | 0.100 | 0.100 | 2400 |
| 3200 | 0.250 | 0.125 | 0.125 | 2400 |
| 3400 | 0.294 | 0.147 | 0.147 | 2400 |
| 3600 | 0.333 | 0.176 | 0.150 | 2426 |
| 3800 | 0.368 | 0.205 | 0.150 | 2451 |
| 4000 | 0.400 | 0.234 | 0.150 | 2464 |
| 4200 | 0.429 | 0.263 | 0.150 | 2465 |
| 4400 | 0.455 | 0.292 | 0.150 | 2455 |
| 4600 | 0.478 | 0.321 | 0.150 | 2433 |
| 4800 | 0.500 | 0.350 | 0.150 | 2400 |
| 5000 | /1 | /1 | /1 | /1 |
| 5200 | /1 | /1 | /1 | /1 |
| 5400 | /1 | /1 | /1 | /1 |
| 5600 | /1 | /1 | /1 | /1 |
| 5800 | /1 | /1 | /1 | /1 |
| 6000 | /1 | /1 | /1 | /1 |
| 6200 | /1 | /1 | /1 | /1 |
| 6400 | /1 | /1 | /1 | /1 |

1/ Wild harvest rates at run sizes above 4,800 will be determined by agreement through the annual management planning process.
2/ Harvest rates at intermediate run sizes will be interpolated, accordingly.

**LITIGATION SCHEDULE IN THE ABSENCE OF A MULTI–YEAR MANAGEMENT PLAN**

State to Supplement Interrogatory Responses July 8, 2005

| | |
|---|---|
| All Parties May Review Documents Produced | July 1–22, 2005 |
| Exchange of Expert Reports and Disclosures | July 29, 2005 |
| Identification of Non–Expert Witnesses | August 5, 2005 |
| Exchange of Rebuttal Expert Reports and Disclosures | August 26, 2005 |
| Depositions | Aug. 15–Sept. 12, 2005 |
| Deadline for Filing Dispositive Motions | September 16, 2005 |
| State and Tribes Serve Pretrial Statements (CR 16(h)) | October 3, 2005 |
| State and Tribes Serve Responses to Pretrial Statements (CR 16(i)) | October 7, 2005 |
| Conference of Attorneys (CR 16(k)) | October 28, 2005 |
| Pretrial Order Lodged (CR 16(l)) | November 4, 2005 |
| Final Pretrial Conference (CR 16(m)) | November 14, 2005 |
| Trial | To Be Set By Court |

Accordingly, the parties jointly request a stay of this proceeding until July 1, 2005 to permit, if necessary, the parties additional time for negotiation of a long term management plan that would remove the need for further litigation of the underlying issue.

## ORDER

IT IS HEREBY ORDERED THAT this subproceeding is stayed until July 1, 2005, on the terms set out in the above stipulation of the parties. If no long-term agreement has been reached by July 1, 2005, the litigation schedule set out above in the stipulation of the parties shall go into effect without further order of this court. If a long-term agreement is achieved by July 1, 2005, the Court will sign an Order of Dismissal, without prejudice, pursuant to Fed.R.Civ.P. 42(a)(1)(ii). The parties will provide an update regarding this subproceeding to the Court by July 1, 2005.

## ORDER DENYING MOTION FOR A TEMPORARY RESTRAINING ORDER

Subproceeding 04–1

(July 16, 2004)

This matter is before the Court on the Motion for a Temporary Restraining Order (TRO) filed by the Port Gamble S'Klallam and Jamestown S'Klallam Tribes (Tribes). The Court, having reviewed the file and heard oral argument on the motion, finds that the Tribes have failed to show good cause why the Skokomish Tribe should be restrained from proceeding with the Hood Canal shrimp fishery under Regulation s04–84. Accordingly, the Motion for a TRO is DENIED.

The Court acknowledges the good faith agreement of the Skokomish tribal council, made in open court, to set aside one thousand pounds of shrimp from the current harvest for the Tribes' ceremonial needs. The parties are urged to continue to negotiate in the spirit represented by the Skokomish stipulation, illustrating the close inter-tribal relationship between the par-

ties as set forth in the Hood Canal Agreement. Should such negotiations fail to achieve an agreement, the parties may jointly or individually file a Request for Determination and request the Court to appoint a settlement judge to aid in resolution of the issues by agreement rather than by further litigation.

### STIPULATION AND ORDER OF DISMISSAL

Subproceeding 03–1

(September 27, 2004)

This stipulation of dismissal is entered into between all parties to *United States v. Washington*, Subproceeding No. 03–1. The parties reached an agreement outlined in the Stipulation and Order of Continuance signed by the Court on July 13, 2004. As explained in that stipulation, the framework management plan for the Hoh River Winter Steelhead for the 2004–2005 to 2006–2007 seasons was made contingent upon the Washington Fish and Wildlife Commission ("Commission") adopting a rule allowing some retention of wild steelhead. On September 2, 2004 the Commission adopted such a rule. As a result, the contingency for the framework management plan has been met, providing enough certainty for the next three seasons that the parties have agreed to dismiss this subproceeding without prejudice.

### ORDER

IT IS HEREBY ORDERED that *United States v. Washington*, Subproceeding No. 03–1 is dismissed without prejudice.

### ORDER GRANTING SUQUAMISH TRIBE'S MOTION FOR SUMMARY JUDGMENT RE: A & K TRUST

Subproceeding No. 89–3–03 (Shellfish)

(March 21, 2005)

This matter comes before the Court on the Suquamish Tribe's Motion for Sum-

mary Judgment Re: A & K Trust. The Court has considered the papers submitted and the oral arguments presented by the parties. The Court hereby GRANTS the Suquamish Tribe's Motion for Summary Judgment Re: A & K Trust. The Court hereby ORDERS as follows:

1. The Tribe shall have the opportunity to immediately harvest its treaty share of the harvestable biomass of clams present on the Trust's Erlands Point property— 50,463 pounds of manila clams and 13,335 pounds of native littleneck clams—in compliance with section 7.2 of the Revised Shellfish Implementation Plan. The Tribe shall inform the Trust and WDFW of the dates that it will harvest as soon as practical.

2. The Trust, or anyone acting on its behalf or in concert with it, shall not harvest any clams from the Trust's Erlands Point property until the Tribe has completed the harvest of its allocation or until five months have elapsed from the date of the Court's order, whichever comes first. The Tribe shall promptly notify the Trust when it has completed the harvest of its allocation.

3. The clerk is directed to enter judgment accordingly.

### ORDER ON MOTION OF CERTAIN TRIBES TO ADOPT AN INTERIM HALIBUT COMMERCIAL FISHERY MANAGEMENT PLAN

Subproceeding No. 91–1

(May 3, 2005)

This matter is before the Court for consideration of a motion by certain named tribes to adopt an interim plan for the 2005 commercial halibut fishing season. The motion was filed by nine of the tribes

having an interest in the halibut fishery, namely the Jamestown, Lower Elwha, and Port Gamble S'Klallam Tribes, the Makah Tribe, the Lummi Nation, the Quinault Tribe, the Suquamish Tribe, Swinomish Tribal Community, and the Tulalip Tribes. In the motion, filed just days before the opening of the 2005 commercial halibut fishery, these Tribes ask the Court to adopt their proposed 2005 interim management plan, provided no other Tribes objected. The Quileute Indian Tribe filed a response to the motion, asking that the Court not adopt the 2005 plan. On March 21, 2005, the Monday following the March 18 noting date for the motion, the Hoh Indian Tribe filed a declaration which the Court construes as an objection. By this time the 2005 halibut season was well underway.

Accordingly, the Court declines to adopt the proposed interim management plan. Instead, a hearing shall be held to address the issues raised in the moving Tribes' motion, to assess their effect on the current halibut season, and to develop a plan to avoid a recurrence of this dispute in the 2006 season.[1] The hearing is set on the Court's calendar for Thursday, June 2 at 1:30 pm. The Tribes who are parties to this subproceeding may file pre-hearing memoranda, including any suggestions for avoiding recurrence, on or before Friday, May 27, 2005.

## ORDER ON PENDING MOTIONS

### (September 6, 2005)

### Subproceeding No. 05–3

This matter is before the Court for consideration of the motion to dismiss filed by the Suquamish Tribe ("Suquamish") and a motion for leave to file a cross-request for determination by the Swinomish Indian Tribal Community ("Swinomish"). The Court has reviewed the motions, the responses and replies, and relevant case documents. For the reasons set forth below, the Court now DENIES the motion to dismiss, and GRANTS the motion for leave to file a cross-request for determination.

## I. Motion to Dismiss

In 1974, in language that lies at the heart of the current dispute, the Honorable George Boldt described the usual and accustomed fishing grounds ("U & A") of the Suquamish as follows:

> The usual and accustomed fishing places of the Suquamish Tribe include the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.

*United States v. Washington*, 459 F.Supp. 1020, 1049 (1978). A dispute has arisen among several Tribes concerning whether this language includes certain areas on the east side of Whidbey Island. This request for determination ("Request") was filed by the Upper Skagit Indian Tribe ("Upper Skagit"), who ask the Court to determine that certain defined areas of Saratoga Passage and Skagit Bay are not within the Suquamish U & A as defined by Judge Boldt.

The Suquamish have moved to dismiss the Request for lack of jurisdiction and failure to state a claim, as well as under the doctrine of res judicata. They argue that their U & A has been specifically determined, and that the Court does not now have jurisdiction under the permanent injunction in this case to alter or amend

---

1. The Court notes that similar disputes, resulting in requests by one or more Tribes for the Court's intervention, arose in 2001, 2002, and 2003. Dkt. ## 75, 88, 109.

that determination. They also assert that the Request fails to allege any cognizable legal theory justifying relief. None of these arguments is persuasive.

Under Paragraph 25 of the permanent injunction in this case, as modified August 23, 1993, this Court retains jurisdiction to consider "[w]hether or not the actions intended or effected by any party ... are in conformity with Final Decision # I or this injunction.; ..." The Request alleges that the Suquamish have been fishing for crab in certain areas on the east side of Whidbey Island that are within the Upper Skagit's own U & A, and that this action is not in conformity with Judge Boldt's determination of the Suquamish U & A because this area is not included within Puget Sound as Judge Boldt intended that term This Court therefore has jurisdiction under Paragraph 25 to consider this Request.

The Court agrees with Suquamish that the U & A determination is a final decision that cannot now be altered or amended. It may, however, be clarified, as this Court has done on several prior occasions where Tribes have disagreed on the reach of the term "Puget Sound" as used by Judge Boldt in his various U & A determinations. *Muckleshoot Indian Tribe, et al. v. Lummi,* 141 F.3d 1355 (9th Cir.1998) (*"Muckleshoot I "*), *Puyallup Indian Tribe, et al. v. Muckleshoot Indian Tribe,* 235 F.3d 429 (9th Cir.2000) (*"Muckleshoot III "*). Indeed, The Suquamish have themselves complained of the "maddening imprecision and inconsistency with which the Court, the parties, the witnesses, and the exhibits in this case have used the phrase 'Puget Sound.'" Brief of Appellees in *Muckleshoot III,* Dkt. # 25, Exhibit A.

As there is sufficient ambiguity in Judge Boldt's use of the term "Puget Sound" in describing the Suquamish U & A to require clarification, and there is at present a live controversy between the parties because of that ambiguity, the motion to dismiss the Request is DENIED.

## II. Motion for Leave to File a Cross–Request for Determination

The Swinomish have filed a motion for leave to file a cross-request for determination, pursuant to Paragraph 25(b)(4) of the permanent injunction. They assert that the term "Puget Sound" as used by Judge Boldt in describing the U & A of the Suquamish requires clarification, and they ask for a determination that certain waters on the east side of Whidbey Island were not included in that determination. The Suquamish, in response, contend that the cross-request is not ripe because the Swinomish did not follow the pre-litigation "meet and confer" procedures set forth in Paragraph 25. However, under Paragraph 25(b)(4), no specific requirement for a meet and confer is imposed upon a party seeking to file a cross-request. Instead, the party must seek leave of Court, which the Swinomish have done. While cross-requests are discouraged and leave to file them may often be denied, this case presents circumstances in which the cross-request is deemed appropriate. A clarification of the term "Puget Sound" in the Suquamish U & A will affect the Swinomish as it will the Upper Skagit. The Swinomish motion for leave to file a cross-request for determination is accordingly GRANTED.

## III. Motion to Strike.

In their reply on the motion to dismiss, the Suquamish move to strike the declaration of Barbara Lane, attached to the Upper Skagit's response to the motion to dismiss. The Suquamish contend that it is a conflict of interest for Dr. Lane to represent an opposing party and testify against her own testimony. Dr. Lane ac-

cording to her declaration, however, prepared and submitted reports on all tribes except the Yakima. In order for there to be a conflict of interest the Suquamish must establish they had a confidential relationship with Dr. Lane. *Wyatt By and Through Rawlins v. Hanan,* 871 F.Supp. 415 (M.D.Ala.1994). The Suquamish do not claim there is one, nor does it appear likely this is the case given Dr. Lane's work with almost all the Tribes in *U.S. v. Washington.*

The Suquamish further argue that the declaration should be stricken because it is latter-day testimony that is inadmissible under *Muckleshoot I.* The Court agrees. The Ninth Circuit Court of Appeals held that the only relevant evidence in this type of subproceeding is what was before Judge Boldt at the time of his decision. *Muckleshoot I,* 141 F.3d at 1359. Accordingly, the motion to strike the Declaration of Barbara Lane is GRANTED.

### IV. Motion for Summary Judgment and Motion to Strike.

The Upper Skagit filed a motion for summary judgment which was ripe for determination on September 2, 2005. The Suquamish, in response, moved to strike that motion as premature. As a determination on the merits of this matter will require the submission by the parties, and review by the Court, of evidence that was before Judge Boldt some thirty years ago, and that evidence has yet to be presented, the Court finds that the summary judgment motion is indeed premature. Accordingly, the Suquamish motion to strike (Dkt. # 40) is GRANTED, and the Upper Skagit motion for summary judgment (Dkt. # 22) is STRICKEN, without prejudice to re-filing at the proper time.

The Clerk shall now issue an Order directing the filing of a Joint Status Report.

### ORDER ON MOTION FOR RECONSIDERATION

Subproceeding 05–01

(October 21, 2005)

The Skokomish Indian Tribe ("Skokomish") has moved for reconsideration of the Court's July 20, 2005 Order on the parties' cross-motions for summary judgment on all claims. Such motions are disfavored and will be denied in the absence of "a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier...." Local Rule CR 7(h)(1). The Court finds that the Skokomish motion has failed to meet this standard, except in one area as set forth below.

First, the Skokomish assert that the Court overlooked catch data which showed that they did not regulate S'Klallam fishing, because the S'Klallam actually caught more crab and geoduck than did the Skokomish. "In light of this catch data, it is inconceivable that the Skokomish letters amount to an 'exercise' of its 'primary right' 'against' the S'Klallams." Motion for Reconsideration, p. 4. This argument overlooks the language of the Hood Canal Agreement, in which the Skokomish agreed not to "exercise or **seek to exercise**" its primary right against the S'Klallam or other stipulating Tribes in Hood Canal north of Ayock Point. *United States v. Washington,* 626 F.Supp. 1405, 1469 (W.D.Wash.1985) (emphasis added). It was the Court's ruling that the Skokomish **sought** to regulate other Tribes' fishing by issuing unilateral harvest plans and quotas for the other Tribes, and that such **attempt** to regulate constituted a violation of the Hood Canal Agreement. The actual amounts subsequently harvested are irrelevant to that determination.

Next, the Skokomish assert that the Court "misapprehended" the effect of letters written by the Skokomish Tribe to other Tribes, and argue that "it is manifestly improper for the Court to grant summary judgment by relying on evidentiary matters to which the Skokomish Tribe had no notice were at issue." Motion for Reconsideration, p. 8. The Skokomish by this argument refer to the Court's finding that these letters, with their accusations of bad faith, constituted an assertion of social disapproval. Social disapproval and magical retaliation were previously found by the Court, Judge Boldt presiding, to be the primary methods by which the Twana, as aboriginal predecessors of the Skokomish, regulated fishing by other Tribes in their own fishing grounds. *Id.* at 1491. There was no lack of notice on this issue; it was the Skokomish Tribe that itself put the tribal methods of fishing regulation at issue by contending that such regulation of other Tribes' fishing required an exercise of police powers, or the imposition of time, place or manner restrictions. In rejecting that argument, the Court referred back to Judge Boldt's earlier language to find that regulation could be accomplished by means other than physical force. Only if "the other deterrents proved inadequate" would the Twana have responded with physical force. *Id.* As to magical retaliation, it should have been clear that the Court was not serious in suggesting, in a footnote, that threats of litigation might be the modern-day equivalent. The Court finds no basis for reconsidering its ruling in this area.

The third argument put forth by the Skokomish is that the Court "Misapprehended the Requested Relief As Nothing in the Hood Canal Agreement ... Supports a Declaration of an "In–Common" Fishing area." Motion for Reconsideration, p. 9. The Court did not "misapprehend" the relief requested by the S'Klallam Tribes; the Request for Determination clearly asked for a declaration that the area of Hood Canal north of Ayock Point be designated an "in-common" management area. Request for Determination, p. 10. Nor does the designation of the area as an "in-common" management area conflict with the language of the Hood Canal Agreement, which states that in this area "the Skokomish and the Klallam Bands may exercise their respective treaty fishing rights without any limitation or control whatsoever ... except as the stipulating parties **may mutually agree by compact or otherwise.**" *U.S. v. Washington,* 626 F.Supp. at 1469 (emphasis added). However, the Court notes that the S'Klallam did not actually include this aspect of the Request for Determination in the motion for summary judgment. *See,* Motion for Summary Judgment, Dkt. # 141; Proposed Order, Dkt. # 147. That portion of the Order declaring the area north of Ayock Point an "in-common" management area shall therefore be stricken.

Finally, the Skokomish assert that "the Court Misapprehended the Language of the Hood Canal Agreement" by stating at page 7, lines 20–21 that "the Skokomish may not exercise [their] primary right against the S'Klallam" It is the Skokomish position that this language, by omitting reference to the area north of Ayock Point, changes the meaning of the Hood Canal Agreement. That is not so. The omission of the limiting language "north of Ayock Point" did not write it out of the Hood Canal Agreement; that language was implicit in the Court's statement even though not expressly quoted. Similarly, as to the Court's discussion of "consent", the Skokomish argue that the Court "has turned the Agreement on its head by shifting the authority to grant consent from the Sko-

komish Tribe to the Two S'Klallam Tribes." Motion for Reconsideration, p. 12. That is not the case. The Court's use of the word "consent" on page 6 was linked to previously-quoted language in the Hood Canal Agreement in which

the Skokomish agreed that 'it will not, under any condition or for any reason whatsoever, exercise or seek to exercise its primary right on Hood Canal north of Ayock Point ... against any of the other stipulating parties without its or their express consent.'

Order on Cross–Motions for Summary Judgment, p. 2, *quoting U.S. v. Washington*, 626 F.Supp. at 1469. Contrary to the Skokomish argument, this language clearly requires the consent of the S'Klallam Tribes before the Skokomish can exercise their primary right north of Ayock Rock. By referring to this "consent", the Court did not, in the words of the Skokomish, turn the Hood Canal Agreement "on its head."

Plaintiff's motion for reconsideration is accordingly GRANTED IN PART and DENIED IN PART. The Court STRIKES that portion of the Order declaring "that the area north of Ayock Point is an 'in common' management area...." Order on Cross–Motions for Summary Judgment, p. 8. The Court declines to further modify or reconsider the Order.

## ORDER ON MOTION TO DISMISS

### Subproceeding No. 05–4

### (October 27, 2005)

This matter is before the Court for consideration of the motion to dismiss filed by the Suquamish Tribe ("Suquamish"). The Court has reviewed the motion, the response and replies, and relevant case documents. For the reasons set forth below, the Court now GRANTS the motion to dismiss.

## DISCUSSION

This is the second Request for Determination filed this year concerning the extent of the usual and accustomed fishing grounds ("U & A") of the Suquamish, described by the Honorable George Boldt in 1974 as follows:

The usual and accustomed fishing places of the Suquamish Tribe include the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits, the streams draining into the western side of this portion of Puget Sound and also Hood Canal.

*United States v. Washington*, 459 F.Supp. 1020, 1049 (1978). In June, 2005, two months before this subproceeding was initiated, the Upper Skagit Indian Tribe ("Upper Skagit") filed a Request for Determination ("Request") asking the Court to determine that certain defined areas of Saratoga Passage and Skagit Bay, both to the east of Whidbey Island, are not within the Suquamish U & A as defined by Judge Boldt. *U.S. v. Washington*, Cause No. 70–9213, sub-proceeding 05–03. The Swinomish Indian Tribal Community ("Swinomish") moved for leave to file a Cross–Request for Determination to include a larger portion of Saratoga Passage, known as Catch Reporting Area 24C, and the motion was granted. The Suquamish then moved to dismiss the Request for lack of jurisdiction and failure to state a claim, as well as under the doctrine of res judicata.

The Court found in sub-proceeding 05–03 that it retained jurisdiction under Paragraph 25 of the permanent injunction in this case, as modified August 23, 1993, to consider the Request of the Skagit and Swinomish. And although the Court noted its agreement with Suquamish that the U & A determination is a final decision that

cannot now be altered or amended, it found that it may be clarified where necessary. Without specifically finding that the term "Puget Sound" is ambiguous in the context of the Suquamish U & A, the Court found sufficient ambiguity in Judge Boldt's use of the term "Puget Sound" in this case to allow that sub-proceeding to go forward. The Court therefore denied the motion to dismiss.

This Request for Determination was filed as sub-proceeding 05–04 by the Tulalip Tribes ("Tulalip"), who ask the Court to find that all of Saratoga Passage, together with additional areas designated as Perm Cove, Holmes Harbor, Port Susan, Tulalip Bay, Port Gardner, a portion of Possession Sound, and the east side of Admiralty Inlet, including Admiralty Bay, Mutiny Bay, Useless Bay, and Cultus Bay, all lie outside the Suquamish U & A as defined by Judge Boldt. The Suquamish have moved to dismiss the Request, this time asserting three bases for dismissal: lack of subject matter jurisdiction, res judicata, and laches. The Tulalip, in response, have asked the Court to follow the ruling in sub-proceeding 05–03 and deny the motion to dismiss. There are, however, significant differences between the positions of the parties in the two sub-proceedings, which here compel a different result.

In 1974 or 1975, the Tulalip Tribes filed a Request for Determination as to their own U & A. Judge Boldt noted that the areas claimed by the Tulalip as usual and accustomed fishing grounds included

(1) All marine waters of the State of Washington lying within the lands and waters ceded to the United States of America by Article I of the treaty of Point Elliot.

. . . .

(3) All marine waters of Puget Sound and of the Strait of Juan de Fuca lying within the territorial limits of the State of Washington and outside of those waters ceded to the United States of America by Article I of the treaty of Point Elliot.

*U.S. v. Washington,* 459 F.Supp. at 1058. Judge Boldt issued provisional findings limiting the Tulalip U & A to a clearly defined area, described as "[b]eginning at Admiralty Head on Whidbey Island and proceeding south …," thence southeasterly, northeasterly, and northwesterly up to a line "drawn true west of Camano on Camano Island." *Id.* at 1059. This was a provisional finding, and various Tribes, including the Suquamish, entered into negotiations with the Tulalip Tribe for final determination of the Tulalip U & A.

In 1983, the Suquamish, Muckleshoot, and Tulalip Tribes entered into a stipulated settlement which resolved "some of the issues raised in the Tulalip Tribes' request for final determination…." Suquamish Reply, Dkt. # 13, Exhibit 2. That stipulation was filed with and approved by the Court, Judge Craig presiding, in 1983. *U.S. v. Washington,* 626 F.Supp. 1405, 1476–78 (W.D.Wash.1985). Subsequently, in 1985, Judge Craig issued a final decision as to the U & A of the Tulalip Tribe, the extent of which is not directly relevant to these proceedings. *Id.* at 1527–1532. Notably, however, Judge Craig referred at several points to the stipulated settlement agreements reached with the Suquamish and Muckleshoot Tribes, as well as eight other Tribes. *Id.,* Finding of Fact ¶ 383, Conclusions of Law ¶¶ 94, 100, 101, 102. The Court stated,

Pursuant to those agreements the stipulating tribes, with a single limited exception, did not participate in the adversarial proceedings of this dispute and thus had no opportunity to present evidence of their own, to cross-examine Tulalip witnesses or to challenge Tulalip evi-

dence. Some of the evidence offered by the Tulalip Tribes dealt with activities, persons or events in areas which are of concern to the stipulating tribes. It should therefore be stressed that the findings of fact and conclusions of law which are adopted in this proceeding are not to be cited or relied' upon in any manner against or to the prejudice of the stipulating tribes in this or any other judicial or other proceeding, provided that this shall not prevent the independent establishment of the same fact or conclusion in a future proceeding.

*Id.,* Finding of Fact ¶ 383.

In May of 1985, the Suquamish filed a new Request for Determination seeking to establish their right to fish in certain areas as successors to the treaty-time Duwamish Tribe. The Court, after referring the matter to a Special Master for trial, denied the Request, and that denial was affirmed on appeal. *U.S. v. Suquamish Indian Tribe,* 901 F.2d 772 (9th Cir.1990). The appeals court, in setting forth the background of the dispute, variously used the terms "eastern Puget Sound", "eastern side of Puget Sound", and "east of Puget Sound" apparently interchangeably, and also referred to the Suquamish U & A area as "western Puget Sound" and "the west side of Puget Sound" without actually defining those areas. These vague references to "eastern" and "western" Puget Sound appear to form part of the basis for the Tulalip's Request here. The Court notes, however, that when describing the actual usual and accustomed fishing grounds of the Duwamish "on the eastern side of Puget Sound", the appeals court stated that they "included, but were not limited to, Lake Washington, Lake Union, Lake Sammamish, the Black and Cedar Rivers, and the lower White or Duwamish River..." *U.S. v. Suquamish Indian Tribe,* 901 F.2d 772, 774 n. 2 (9th Cir.1990).

The Court has described these prior proceedings with some particularity, because each of them provides some basis for finding that the Tulalip's Request for Determination is either barred or untimely, and must be dismissed.

In the initial proceedings on their Request for Determination before Judge Boldt in 1975, the Tulalip Tribe claimed as their usual and accustomed fishing areas "[a]ll marine waters of Puget Sound and of the Strait of Juan de Fuca lying within the territorial limits of the State of Washington," together with "[a]ll marine waters of the State of Washington lying within the lands and waters ceded to the United States of America...." *U.S. v. Washington,* 459 F.Supp. at 1058. Significantly absent from this claim is any separate reference to Saratoga Passage, Port Susan, Skagit Bay, or any of the other areas near the Tulalip Indian Reservation which the Tulalip now contend are not within "Puget Sound" as Judge Boldt used that term in describing the Suquamish U & A. Thus, the Tulalip claim in 1975 to a U & A in "all marine waters of Puget Sound" must necessarily have included those very areas to the east of Whidbey Island which they now assert are excluded. In other words, they are now arguing for a limitation on the term "Puget Sound" which is inconsistent with their 1975 claim This is impermissible, particularly in the context of this case.

The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, may be invoked to prevent a party from changing its position over the course of judicial proceedings. *Russell v. Rolfs,* 893 F.2d 1033, 1037 (9th Cir.1990). It is an equitable doctrine invoked by the Court at its discretion. *Yanez v. United States,* 989 F.2d 323, 326 (9th Cir.1993). Judicial estoppel applies to a party's stated position, wheth-

er that be an expression of intention, a statement of fact, or a legal assertion. *Wagner v. Professional Engineers in California Government,* 354 F.3d 1036, 1044 (9th Cir.2004). The purpose of the doctrine is to protect the integrity of the judicial process. *Rissetto v. Plumbers and Steamfitters Local 343,* 94 F.3d 597, 601 (9th Cir.1996); *quoting Yanez v. U.S.,* 989 F.2d at 326.

■ Although it appears that this doctrine may well apply to the inconsistent positions taken by the Tulalip Tribe on the extent of "Puget Sound" here, the Court declines to apply judicial estoppel to bar this Request at this time because it has been raised on the Court's own motion, and the Tulalip have not been given an opportunity to respond. However, the Court deems it unnecessary to delay the proceedings to allow such opportunity, because the Request is subject to dismissal on other grounds asserted by the Suquamish Specifically, the Court agrees with the Suquamish that this Request is barred by the doctrines of laches and res judicata.

■ "Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action." *Owens v. Kaiser Foundation Health Plan, Inc.,* 244 F.3d 708, 713 (9th Cir.2001); *quoting Nelson v. City of Irvine,* 143 F.3d 1196, 1200 (9th Cir.1998). The doctrine is applicable when there is (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between the parties. *Id.* These requirements are met here. Res judicata applies to the Judge Boldt's 1975 rulings on the Suquamish U & A, Judge Craig's 1985 ruling on the Tulalip U & A, and to the 1983 stipulated settlement between the Suquamish and the Tulalip, which resolved overlapping claims to some of the areas now in dispute. That settlement was in-

corporated into a judgment which conclusively determined the issues as between these two parties. *U.S. v. Washington,* 626 F.Supp. at 1476–78. To any extent that the Tulalip claim that the Suquamish U & A did not include certain areas on either side of Whidbey Island as asserted here, they could and should have raised that issue and resolved it in the 1975 proceedings and /or the 1983 settlement. It would seriously impact the finality of those judgments to allow them to re-open the issue now.

■ Finally, to the extent that the Tulalip argue that the Ninth Circuit's 1990 language regarding eastern and western Puget Sound in *U.S. v. Suquamish Indian Tribe* somehow limited the Suquamish U & A to the boundaries asserted here, they are barred from asserting that claim by the doctrine of laches. "Laches is an equitable time limitation on a party's right to bring suit." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 835 (9th Cir.2002) (*quoting Boone v. Mech. Specialties Co.,* 609 F.2d 956, 958 (9th Cir.1979)). A party asserting laches must show that it suffered prejudice as a result of the plaintiff's unreasonable delay in bringing suit. *Id., citing Couveau v. American Airlines, Inc.,* 218 F.3d 1078, 1083 (9th Cir.2000). The fifteen years that have passed since the Ninth Circuit's language provided fuel for the Tulalip "eastern Puget Sound" argument constitute unreasonable delay. The Suquamish have been prejudiced by this delay, in that they have been intimidated from fishing in certain areas, with no judicial resolution of the dispute. *See,* Declaration of Robert Purser.

In opposing the Suquamish laches argument, the Tulalip assert that laches should not be applied in a "continuing jurisdiction" case such as this. No legal authority is offered for this proposition, and the Court rejects it. While the Court did and

does retain jurisdiction to hear and determine certain claims in this case, as set forth in Paragraph 25 of the Permanent Injunction, all applicable legal and equitable doctrines still apply to claims within that jurisdiction.

Accordingly, the Suquamish motion to dismiss is GRANTED, and this Request for Determination is DISMISSED. To the extent that this ruling differs from the ruling issued in Subproceeding 05–03, that difference is compelled, as noted above, by the prior history of these two parties, and by the additional argument of laches asserted by the Suquamish in this subproceeding.

## ORDER ON MOTION TO COMPEL

### Subproceeding No. 05–3

### (December 19, 2005)

This matter is before the Court for consideration of the motion to compel filed by the Upper Skagit Indian Tribe ("Upper Skagit"). The motion has been opposed by the Suquamish Tribe ("Suquamish"). For the reasons set forth below, this motion is DENIED.

## DISCUSSION

■ This subproceeding was initiated by the Upper Skagit as a Request for Determination under Paragraph 25 of the permanent injunction herein. The Upper Skagit asked the Court to find that certain defined areas of Saratoga Passage and Skagit Bay, described as the "Subproceeding Area", are not within the usual and accustomed fishing area ("U & A") of the Suquamish as it was described by Judge Boldt in 1974. Although the Upper Skagit did not specifically cite a jurisdictional basis for this Request, the Court has found that it has jurisdiction pursuant to Paragraph 25(a)(1), which states that the Court retains jurisdiction to determine "[w]hether or not the actions intended or effected by any party ... are in conformity with Final Decision # 1 or this injunction...." Order Modifying Paragraph 25 of Permanent Injunction, dated August 23, 1993.[1] The Court denied a motion to dismiss by the Suquamish, finding that there is sufficient ambiguity in Judge Boldt's description of that U & A to allow this Request for Determination to proceed.[2] The Court also cited to language to the effect that "the only relevant evidence in this type of subproceeding is what was before Judge Boldt at the time of his decision." Order dated September 6, 2005. As this statement oversimplifies the rulings of the Ninth Circuit Court of Appeals in the cases which guide the Court in these proceedings and in this discovery dispute, relevant portions of those opinions must be reviewed.

In *Muckleshoot I*, one issue before this Court was the extent of the U & A of the Swinomish Tribal Community, described in *Decision II* as including "the marine areas of northern Puget Sound *south to and including* Whidbey Island...." Finding of

1. This paragraph refers to "Final Decision # 1", meaning *U.S. v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974) (*"Decision I"*), while the Suquamish U & A was described by Judge Boldt in *U.S. v. Washington*, 459 F.Supp. 1020, 1059 (W.D.Wash.1978) (*"Decision II"*). Because the location of the U & A was "specifically determined" in *Decision II*, it is subparagraph (a)(1), rather than (a)(6), which provides jurisdiction over this Request. See, *Muckleshoot Tribe, et al. v. Lummi Indian Tribe*, 141 F.3d 1355, 1360 (9th Cir.1998) (*"Muckleshoot I"*).

2. The Court's ruling would have better been expressed with the language "There is sufficient ambiguity **surrounding** Judge Boldt's use of the term 'Puget Sound'..," and the previous Order is hereby amended to reflect that modification.

Fact ("FF") 6, 459 F.Supp. at 1049 (emphasis added). The Ninth Circuit Court of Appeals affirmed this Court's grant of summary judgment against the Swinomish Tribal Community, finding that the Swinomish had offered "no evidence that suggests that FF6 is ambiguous or that the court intended something other than its apparent meaning...." *Muckleshoot I*, 141 F.3d at 1359.

A second issue before the Court in *Muckleshoot I* was the southern extent of the Lummi Tribe's U & A, described in *Decision I* as including "marine areas of Northern Puget Sound from the Fraser River *south to the present environs of Seattle ...*" FF 46, 384 F.Supp. at 360 (emphasis added). The Ninth Circuit reversed this Court's grant of summary judgment against the Lummi Tribe, finding that the district court erred in considering latter day testimony of an expert whose anthropological report was cited by Judge Boldt. *Muckleshoot I*, 141 F.3d at 1359. The court also erred in entering supplemental findings, under subparagraph f of Paragraph 25 (now Paragraph 25(a)(6)), by which the Court retains jurisdiction "to determine the location of a tribe's usual and accustomed fishing grounds not specifically determined by [*Decision I*]...." *Id.* at 1360. The appeals court noted that this subsection "does not authorize the district court to clarify the meaning of terms used in the decree or to resolve an ambiguity with supplemental findings which alter, amend or enlarge upon the description in the decree." *Id.* The Court was instead instructed to proceed under subparagraph a of Paragraph 25 (now subparagraph (a)(1)) to resolve the dispute. The appeals court then stated that

> [i]t will be up to the parties to offer admissible evidence to enable the district court to interpret the decree in specific geographic terms. While evidence that was before Judge Boldt when he made his finding is obviously relevant, there may be other evidence indicative of the contemporary understanding of "the present environs of Seattle."

*Id.*

After remand, the matter went back to the Ninth Circuit Court of Appeals. *Muckleshoot Indian Tribe v. Lummi Indian Nation*, 234 F.3d 1099 (9th Cir.2000) ("*Muckleshoot II*"). The appeals court reiterated the principle that "the critical issue was the meaning Judge Boldt intended at the time he wrote his opinion." *Id.* at 1100, *citing Muckleshoot I*, 141 F.3d at 1359. However, in so finding, the appellate court did not "freeze the record"; indeed it approved the use of a geography expert to assist the district court in determining "where the northern environs of Seattle were located at the time of Judge Boldt's decision." *Id.* The court ruled that the district court correctly interpreted Judge Boldt's opinion "on the basis of information known to Judge Boldt and the words he chose." *Id.* at 1101.

Finally, in *Puyallup Indian Tribe, et al. v. Muckleshoot Indian Tribe*, 235 F.3d 429 (9th Cir.2000) ("*Muckleshoot III*"), the Ninth Circuit affirmed this Court's grant of summary judgment against the Muckleshoot Tribe in a dispute involving the extent of their U & A. This was described in *Decision I* as being primarily on various rivers, and "secondarily in the saltwater of Puget Sound." FF 76, 384 F.Supp. at 367. The Muckleshoot argued that this language was unambiguous because " 'Puget Sound' has a well-understood, common geographical meaning." *Muckleshoot III*, 235 F.3d at 432. The opposing Tribes, on the other hand, argued that the phrase "secondarily in the waters of Puget Sound" was ambiguous in the context of the evidence that was before Judge Boldt. *Id.*

In considering the issue, the Ninth Circuit noted that

the parties' debate over whether the language of Finding 76 is unambiguous is largely misdirected, inasmuch as an analysis of the decision is necessary, whether the text is unambiguous or not, in order to understand Finding 76 "in light of the facts of the case." An unambiguous text is certainly a factor to be considered in this analysis, but it does not necessarily terminate the inquiry.

*Id.* at 433. The appeals court then cited its ruling in *Muckleshoot I* as authority for the principle that the Tribe asserting ambiguity or a lack of clarity in Judge Boldt's U & A determination must offer "evidence that suggests that FF[76] is ambiguous or that the court intended something other than its apparent meaning...." *Id., quoting Muckleshoot I,* 141 F.3d at 1359.

These rulings inform this Court's 'decision on the motion to compel, as they define the scope of discovery in this matter. The burden in this subproceeding is on the requesting parties—the Upper Skagit and the Swinomish Tribal Community—to offer evidence that FF 5 is ambiguous, or that Judge Boldt "intended something other than its apparent meaning." *Id.* Since the apparent meaning of the phrase "the marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River including Haro and Rosario Straits...." is in dispute here, it must be determined by the Court. The relevant evidence on this issue is evidence which indicates the contemporary understanding of the extent of "the marine waters of Puget Sound ...", which will "shed light on the understanding that Judge Boldt had of the geography at the time." *Muckleshoot I,* 141 F.3d at 1360; *Muckleshoot II,* 234 F.3d at 1100. This may be provided by supplementation of the record, at the appropriate time, with declarations

of geography experts. *Id.* Such evidence may be offered by the parties to "enable the district court to interpret the decree in specific geographic terms." *Muckleshoot I,* 141 F.3d at 1360.

Should the evidence show that the common understanding of the term "Puget Sound" in 1974 included Saratoga Passage and Skagit Bay, the Upper Skagit or Swinomish Tribe must produce evidence that suggests that Judge Boldt intended something other than this apparent meaning when he wrote FF 5. *Muckleshoot I,* 141 F.3d at 1359. The evidence that is relevant to Judge Boldt's intent comprises "the entire record before the issuing court and the findings of fact [which] may be referenced in determining what was decided." *Muckleshoot I,* 141 F.3d at 1359. It is this evidence which is the subject of this motion to compel.

The documents sought by the Upper Skagit in the motion to compel were originally requested in three Requests for Production:

REQUEST FOR PRODUCTION NO. 1 Please produce all documents and/or information of any type that constituted the evidence before U.S. District Judge George Boldt in 1974 at the time of his original decision in this matter, that referred to, related to, and/or supported in any fashion the contention that the Suquamish Tribe ever fished and/or shellfished in any areas set forth in Subproceeding 05–3, including without limitation Skagit Bay and/or Saratoga Passage.

REQUEST FOR PRODUCTION NO. 2 Please produce all documents and/or other information of any type that was presented to U.S. District Judge George Boldt at any time after 1974 that referred to, related to and/or supported in any fashion the contention that the Suquamish Tribe ever fished

and/or shellfished any areas set forth in Subproceeding 05–3, including without limitation Skagit Bay and/or Saratoga Passage.

REQUEST FOR PRODUCTION NO. 3 Please produce all documents and/or information of any type that constituted the evidence before U.S. District Judge George Boldt at the time of his original decision in this proceeding and/or thereafter concerning the extent and/or boundaries of the usual and accustomed fishing grounds of the Suquamish Tribe.

Motion to Compel, p. 2.

The Suquamish object to producing these documents on three bases: (1) the documents sought are not in their control or possession but rather are in the control and possession of the Court; (2) the documents sought are court records which are public and available to all parties; and (3) the Upper Skagit seek information which is beyond the geographic scope of the dispute as defined in their Request for Determination.

The Court agrees that the documents sought are part of the Court record and equally available to all parties, and DENIES the motion to compel on that basis.[3] These are not, as the Upper Skagit assert, akin to voluminous business records subject to the requirements of F.R.Civ. Proc. 33(d). The burden of locating the relevant documents within the Court record is no greater for the Upper Skagit than it is for the Suquamish. The Court shall assist the parties, upon request (and within reason), by providing copies of relevant exhibits that were considered by Judge Boldt.[4]

Such exhibits are those which will assist the Court in determining "the meaning Judge Boldt intended at the time he wrote his opinion." *Muckleshoot II*, 234 F.3d at 1100. Counsel may contact chambers staff at (206) 370–8883 to arrange for this assistance.

The Court notes that a scheduling Order has not yet been entered in this case, and the parties have requested, in their Joint Status Report, a conference to resolve their differences about scheduling. Such conference, limited to the three Tribes who have actively participated in this case, shall be scheduled by the Court during January 2006. Counsel shall contact the courtroom deputy at (206) 370–8521 after January 3, 2006 to set a date and time for the conference.

## DECISION

Subproceeding No. 89–3–04 (Shellfish)

(December 30, 2005)

KAREN L. STROMBOM, United States Magistrate Judge.

This matter is before the court pursuant to the dispute resolution process set forth in the Revised Shellfish Implementation Plan (Plan). Exh. 1. The Quileute Tribe disputes the State of Washington's plan to open the 2005–2006 commercial non-tribal Dungeness Crab fishery on December 20, 2005. The State proposed this plan pursuant to 4.6 of the Revised Shellfish Implementation Plan. The Quileute Tribe timely objected to the State's proposed regulation and this court conducted a full day hearing on December 16, 2005.

---

3. The Court notes, however, that Requests for Production 2 and 3, to the extent they seek documents that were before Judge Boldt **after** his 1974 decision, seek information that is not relevant to the claims herein.

4. Judge Boldt specifically referenced Exhibits USA–20 to 30 and 53 as "established by a preponderance of the evidence." 384 F.Supp. at 350. In describing the method of determining U & A's, he also referenced Exhibit USA–52, as well as the Final Pretrial Order (FPTO).

Pursuant to 4.7 of the Plan, the Tribe's written objection addressed the proposed opening date of the commercial fishery, which had been scheduled for December 20, 2005.[1] The Quileute Tribe proposes an opening date of January 15, 2006. In its briefing, and during the hearing, the Quileute Tribe also objected to the western boundary of the U & A utilized by the State. The Court notes, however, that this was not raised in the 4.7 written objection. The State utilizes an approximate three mile western boundary delineating the Washington State territorial sea whereas the Quileute Tribe proposes the use of a 40 mile boundary, as defined in federal regulations.

The undersigned sustains the Quileute Tribe's objection to the opening date for the commercial non-tribal Dungeness Crab fishery and finds that the opening should be delayed until January 15, 2006. The undersigned further declines to rule with regard to the request to utilize a forty mile western boundary for the U & A as opposed to the three mile boundary.

## OPENING THE CRAB FISHERY

■ The Quileute Tribe has the right to take fifty percent of the Dungeness Crab found anywhere within the Tribe's usual and accustomed fishing areas. *United States v. State of Washington*, 873 F.Supp. 1422, 1431 (9th Cir.1994). This right is recognized in the Plan. The challenge faced by the parties in this subproceeding is to fashion management techniques which will result in both tribal and non-treaty fishers harvesting their fair share. While the Court recognizes that it will be difficult to reach an exact fifty-fifty share, the law is clear and the management steps taken by the parties must head in the direction of providing treaty and non-treaty fishers a fair opportunity to catch their fair share.

Based on the exhibits and the testimony presented at the hearing, it is apparent that it is not possible to accurately predict the harvestable surplus of Dungeness Crab from year to year. This makes it extremely difficult to "determine" a fair share without the use of hindsight. Section 2.2 of the Plan allows for this situation and requires the Tribes and State to "develop a cooperative approach to management with the goal of maximizing harvest and equalizing allocation, consistent with conservation of the resource." The parties have, in fact, used different management techniques with the goal of "equalizing allocation." These management techniques include the establishment of Special Management Areas (SMA's), gear restrictions, and a "head start" for the tribal fishermen.

Even though a number of management techniques have been employed by the State of Washington in the past, the goal of equal shares was never reached until the 2004–2005 season when, for the first time, the Quileute Tribe harvested 58% of the Dungeness Crab in Area 59A–1. Exh. 16. According to the figures provided by the Quileute Tribe, this was the first time in eight fishing seasons that the tribe harvested more crab than non-tribal fishers. In the 2003–2004 season the tribe harvested 32% of the crab and in the 2001–2002 season it harvested 37%. For all of the other fishing seasons, the Quileute Tribe harvested less than 20% of the crab. The Quileute Tribe attributes their success in the 2004–2005 season to the fact that the State had to delay opening of the fishery until January 16th.

---

1. At the hearing, the State advised the Court that the opening date had been adjusted to

December 31, 2005.

The State presented testimony through Philip Anderson, Special Assistant to the Director of the Department of Fish and Wildlife, regarding Exhibit N. This exhibit set forth percentages of catch by the Quileute Tribe that differ from those set forth in Exhibit 16. Exhibit N, however, was not made by, or under the direction of Mr. Anderson, although he assumes it to be accurate. While the figures used to reflect the non-treaty harvest are the same in both exhibits, the Quileute Tribe actually reported a larger catch for the 2002–2003 and the 2003–2004 seasons than is reflected on Exhibit N. Inasmuch as there was no testimony presented to the Court regarding the source of these numbers, the Court chooses to rely on the figures provided in Exhibit 16.

Three new management techniques are proposed by the State of Washington for the 2005–2006 season. One change is the requirement that all commercial crab fishers fishing in waters adjacent to the Washington coast "attach a buoy tag purchased from the Department of Fish and Wildlife to each piece of gear deployed by the fisher." Exh. 5. This new requirement is intended to enhance the enforceability of the State's current pot limit program which was adopted in 2002. The State has also reached an agreement with the Makah Tribe which creates an additional small northern SMA off the coast near Lake Ozette. Finally, the State of Washington and State of Oregon have reached an agreement to place geographic restrictions on vessels that fish in federal waters adjacent to Washington and Oregon. This means that vessels licensed solely by Oregon will be prohibited from fishing off the Washington Coast. Exh. 5.

The results of the last crab season have confirmed the capability of the Quileute to harvest their fair share and the State acknowledges they have this capability. The State, however, believes that the new buoy tag requirement, the creation of a secondary SMA per agreement with the Makah Tribe, the agreement with the State of Oregon, and the increase in experience of the tribal fishers will allow the Quileute to reach the 50% goal while still opening the non-tribal fishery on December 31, 2005. On the other hand, the Quileute Tribe believes that an additional "headstart" is a significant management technique that must be continued in order to allow them their fair opportunity to harvest their fair share.

This Court has a difficult time seeing how the changes proposed by the State will reach the hoped for result. With regard to the agreement with the State of Oregon, testimony at the hearing offered additional specifics which were not included in the State's initial letter to the Quileute Tribe. Even with the agreement, there are approximately 55 fishing vessels which have dual licenses with both states while approximately 40 boats are just licensed in the State of Oregon. There is no information as to how many of these boats actually fished in 59A–1. This restriction, however, is of further limited use regarding this sub-proceeding in that the 2004–2005 reported harvest of Dungeness Crab landed in Oregon and harvested in 59–A1 was only 9,830 pounds. (Catch Area 10, Exhibit O). The tribal and non-treaty fishers in Washington reported a total catch of 2,765,020 pounds for that season. Exh. 16. The Oregon catch represents less than one percentage point of the total pounds of Dungeness Crab harvested in 59A–1. ($9,830 \div 2,774,850 = 0.00354$). Based on all the information provided by the State, it does not appear that the agreement between the two states will significantly impact the fishing opportunity of the Quileute Tribe.

While the State has reached an agreement with the Makah Tribe and created a secondary SMA, the Court has no information as to the expected impact this would have with regard to the crab harvest by the Quileute Tribe.

Finally, with regard to the purchase of buoy tags, the State's witness was unable to give any accurate prediction as to what, if any, impact this will have on non-tribal fishers exceeding the pot limit. This buoy tag requirement creates the inference that the pot limitation is not being followed by non-tribal fishers. If this is in fact the case, there is nothing before the Court which suggests the extent of this violation or the impact the buoy markers will have on encouraging non-tribal fishers to comply with the law.

Section 4.7 of the Plan places the burden of proof on the Quileute Tribe as its objection has to be based:

on a well-founded assertion that the proposed regulation would result in:

(1) an over-harvest on an allocation or conservation basis in violation of the standards set by the Court in *United States v. Washington,* or other conservation standards agreed to by the State and affected Tribes; or

(2) otherwise violate this Implementation Plan or other applicable orders of the Court. The objection must state the reasons for the objection, the data on which it is based, and any other pertinent information available to the objecting party.

The undersigned finds that the Quileute Tribe has met its burden of proof. The court recognizes that the Quileute Tribe added another boat to its fleet and that its tribal fishers have gained experience in fishing for crab. However, the addition of a single boat, which increases the size of the Quileute fleet to seven is a factor that can be assessed only in hindsight, as is the case with the Dungeness Crab fishery. This court also notes that the State estimates that the non-tribal harvest will include 56 vessels with 15,000 crab pots. *See* Notice of Amended Coastal Dungeness Crab Fishery Opening Pursuant § 4.6. While the additional boat will assist the Quileute Tribe it is not sufficient reason to ignore history.

The delay in the opening of the non-tribal fishing season to the January 16, 2005 date is logically a major factor in the Quileute Tribe's success in the 2004–2005 season. The track record created by the start dates shown in Exhibit 16 for the seasons prior to the 2004–2005 season show that opening the fishery to non-tribal fishers in December does not give the Quileute Tribe a fair opportunity to catch its fair share.

The undisputed testimony is that the Quileute Tribe's goal of reaching the 50/50 share was made known to the State by 2001. However, any changes in the fisheries management did not accomplish the fair share goal until the Quileute Tribe was given a greater head start. This Court is very aware of the fact that the Tribe and the non-treaty fishers are each entitled to their fair share and that the State is concerned that a delay to January 15, 2006 will result in the Quileute Tribe harvesting more than its fair share. That is also a concern of this Court. However, the steps taken to date by the State have not provided the Quileute Tribe with its fair opportunity to catch its fair share and in fact have resulted in over-harvesting every year but one by non-treaty fishers. Adjustments will have to be made based on experience. It may be that the Quileute Tribe will harvest more than 50% this season. No one can know until the season is over. If that is in fact the case, then there will have to be another adjustment to the opening date. It appears that experience is the

best indicator of the future regarding the crab fishery. Prior to the 2003–2004 season, experience showed that the goal was not being reached. The 2003–2004 season, with the delayed opening of the fishery, added an additional element which cannot be ignored by the Court.

By approving the opening date of January 15, 2006 this Court feels compelled to comment on the testimony of Resource Economist Phil Meyer. Mr. Meyer simply took the opening dates of the state fishery and the percentage harvested by the Quileute Tribe corresponding to each opening date and created a linear relationship between the points which he then used to predict an appropriate opening date for non-tribal fishers. He readily admitted that more data points would be helpful in light of the fact that there was only one non-tribal opening date in January and the rest of the opening dates were either in November or December. Mr. Meyer testified that the information was "something I think we can work with." The Court, however, declines to accept this testimony as something to "work with" for purposes of prediction. On cross-examination Mr. Meyers admitted that use of this "predictive model" shows only a 40% Quileute harvest in the 2005–2006 season with an opening date of January 15th. This Court is of the opinion that the model has no real predictive value at this time and gives it no weight.

Another area of concern for this court was the uncontradicted testimony of Mr. Anderson with regard to crab harvested by the Quileute Tribe south of 59A–1. He testified that this catch should be added to the harvest in 59A–1 as it suggests the Tribe is not expending maximum effort in the 59A–1 area. Due to the fact that the testimony was a general statement, the testimony did not impact this Court's decision. This Court also recognizes that the Tribe does not believe that it is a fair comparison to add in that catch. However, for the future, it would be wise to determine whether this is a factor that should be considered. The Tribe is asserting that it needs the additional head start in order to have a fair opportunity to catch its fair share. The Court assumes, from that statement, that maximum effort would be given by the tribe during the head start. If it is not, then it is arguable that the Tribe is not taking advantage of its fair opportunity and that may impact an appropriate opening date for non-tribal fishers.

## WESTERN BOUNDARY OF THE U & A

■ In its written objection to the State, the Tribe stated as follows: "Because the State has focused all of its regulatory actions in Area 59A–1 alone, we will focus on that area as well, even though it is the Tribe's position that this Area does not represent the Tribe's entire U & A." Exh. 6, pages 1 and 2. The objection further stated, at page 3:

While the Tribe firmly believes that it is entitled to 50% of the crab in the Tribe's entire U & A as defined by the federal government for other ocean species, at this point the Tribe will only seek restriction in the area that is bounded by northern line drawn west from Sand Point (48°07′36″) and a southern line drawn west the coast near Destruction Island (47°40′30″).

Based on the statements in the written objection, this Court finds that the Quileute Tribe did not preserve any right to raise the western boundary in this dispute resolution process. In addition, this Court is of the opinion that resolution of the western boundary of the U & A is not an appropriate subject for the dispute resolution process as set forth in the Revised Shellfish Implementation Plan.

Section 1.3 of the Plan requires all provisions of the Plan and "all management plans that are developed from it" to comply with the Court's December 20, 1994 decision. This decision was referred to in the hearing as the Rafeedie decision and is found at *United States v. State of Washington*, 873 F.Supp. 1422 (W.D.Wash. 1994). Judge Rafeedie affirmed the U & A determinations made by Judge Boldt in *Washington I*

> *Washington I* [*U.S. v. State of Washington*, 384 F.Supp. 312 (W.D.Wash.1974)] made a series of determinations as to the meaning and import of the phrase "usual and accustomed grounds and stations," in the context of adjudicating where the plaintiff Tribes enjoyed the right to fish for salmon and steelhead. No party to this sub-proceeding has challenged these determinations, and the Court finds, as explained below, that they are the usual and accustomed grounds and stations for shellfishing.

*Id.* at p. 1430.

The terms of the Revised Shellfish Implementation Plan require adherence to Judge Rafeedie's decision which in turn relies on the finding in *Washington I*. The undersigned finds that any other determination as to the western boundary of the U & A for the Quileute Tribe is not subject to the dispute resolution process as established in the Plan. The Court, therefore, declines to make any ruling in that regard other than to affirm that for purposes of this hearing, the only area impacted by this decision as to the opening date for non-tribal fishers is 59A–1.

**CONCLUSION**

In summary, this Court orders that the opening of the Dungeness Crab commercial non-tribal fishery be set for January 15, 2006, with allowance for the 64–hour gear-setting period which may precede the season opening. The State is further expected to implement the management techniques which were identified in Exhibit 5 and during the testimony of Mr. Anderson (buoy tags, the agreement with the State of Oregon, and the addition of the small northern SMA off the coast near Lake Ozette).

Finally, this Court is denying the request of the Quileute Tribe to rule that the western boundary of its U & A is other than established in the Rafeedie decision and Boldt decision as that is not a proper subject for the dispute resolution process contained in the Plan.

**ORDER ON MOTIONS FOR CLARIFICATION AND FOR RECONSIDERATION**

Subproceeding No. 05–3

(January 23, 2006)

RICARDO S. MARTINEZ, District Judge.

This matter is before the Court for consideration of motions by the opposing parties for clarification and for reconsideration of the Court's December 19, 2005 Order on the Upper Skagit Tribe's motion to compel. Having considered the motions, and the response to the motion for clarification, the Court finds and rules as follows:

(1) <u>Motion for Clarification</u> (Dkt. # 72)

The Suquamish Tribe has asked for clarification of the cut-off date for relevant exhibits in this matter. The Court agrees that exhibits entered in the record up until Judge Boldt's April 18, 1975 ruling on the Suquamish U & A are relevant to an understanding of what he meant in describing that U & A, and hereby amends the previous ruling to reflect that date. However, exhibits considered by Judge Boldt

after that date, in proceedings involving other matters, are not relevant to the meaning he intended on April 18, 1975. Accordingly, the Suquamish Tribe's motion for clarification is GRANTED IN PART and DENIED IN PART.

(2) Motion for Reconsideration (Dkt. # 73)

The Upper Skagit Tribe has asked for reconsideration of the same Order. Such motions are disfavored and will be denied in the absence of "a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier...." Local Rule CR 7(h)(1). No response to such motion is required unless the Court so directs. Local Rule CR 7(h)(3). The Court hereby directs the Suquamish Tribe to respond only to that portion of the motion requesting the Court to order the Suquamish to simply identify, rather than produce, the responsive documents, which are already in the record.

The motion for reconsideration shall be noted on the Court's calendar for February 10, 2006. The response shall be due February 6, 2006, and the Upper Skagit may file a reply on February 10.

## ORDER ON MOTION FOR RECONSIDERATION

Subproceeding No. 05–4

(January 26, 2006)

This matter is before the Court on the motion of the Tulalip Tribes ("Tulalip") for reconsideration of the Court's October 27, 2005 Order granting the motion to dismiss filed by the Suquamish Tribe ("Suquamish"). The Court directed the Suquamish to respond to the motion, pursuant to Local Rule CR 7(h)(3), and the matter has been fully considered. For the reasons set

forth below, the motion for reconsideration is DENIED.

Motions for reconsideration are disfavored and will be denied in the absence of "a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier...." Local Rule CR 7(h)(1). The Tulalip argue that the Court committed error by (1) considering matters outside the pleadings, thereby converting the motion to dismiss into a motion for summary judgment without notice to Tulalip; (2) failing to accept Tulalip's factual allegations as true; and (3) improperly applying the doctrines of laches and res judicata. None of these contentions provides a basis for reconsideration.

In ruling on the motion to dismiss, the Court considered, in addition to the actual pleadings, the motion, response and reply, and the relevant case documents. Dkt. # 17, p. 1. The Court did not consider the Declaration of Robert Purser or the facts alleged therein, except for the limited purpose of establishing prejudice from the delay in asserting this claim To whatever extent this was error, it does not warrant reconsideration of the entire ruling, because the delay of itself creates a rebuttable presumption of prejudice. *Boone v. Mechanical Specialties Company,* 609 F.2d 956, 958 (9th Cir.1979); citing *International T & T Corp. v. General T. & E. Corp.,* 518 F.2d 913, 926 (9th Cir.1975). Other than the bare assertion that there has been no delay, the Tulalip have offered no rebuttal to this presumption.

 As to other documents outside the pleadings, the Court did consider prior rulings in this case, as well as the 1983 settlement agreement between these parties, and found these case documents highly relevant to the motion to dismiss. The Court may take notice of matters of public record without converting the motion to

dismiss into a motion for summary judgment. *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir.2001); citing *MGIC Indemnity Corporation v. Weisman,* 803 F.2d 500, 504 (9th Cir.1986). The settlement agreement and prior Orders are not only a matter of public record, they are part of the record in this very case.[1] The Court may take judicial notice of its own records, whether requested by a party or not. Fed.R.Evid. 201(c); *Chandler v. United States,* 378 F.2d 906, 909 (9th Cir. 1967); citing *Ira S. Bushey & Sons, Inc. v. W.E. Hedger Trans. Corporation,* 167 F.2d 9, 12 (2d Cir.1948).

The Tulalip argue that the Court failed to follow the Rule 12 requirement of accepting all allegations in the Request for Determination as true. Specifically, the Tulalip point to their assertion that the Suquamish only began to fish in the marine waters at issue here in 2003. Had the Court accepted that allegation as true, the Tulalip argue, it could not have found this Request barred by the doctrine of laches. However, the Court's ruling was not based on either side's allegations regarding Suquamish fishing or attempts at fishing in the disputed area. Instead, the Court looked to prior rulings on the matter, namely the determinations of the two Tribes' respective Usual and Accustomed Areas ("U & A's"), the 1983 settlement agreement, and a 1985 subproceeding regarding a Suquamish Request for Determination that they were a successor in interest to the treaty-time Duwamish Tribe.

The Tulalip asserted in their Request for Determination that in 1985, "the Suquamish filed an action to expand their usual and accustomed fishing places to the eastern side of Puget Sound." Request,

¶ 12. They then quote the Ninth Circuit Court of Appeals finding that, in treaty times, the Suquamish "did not fish **in those areas,** which were the usual and accustomed fishing places of the Duwamish." *United States v. Suquamish Tribe,* 901 F.2d 772, 774 (9th Cir.1990). *Id.* It is this aspect of the Request for Determination—the assertion that the Suquamish U & A does not encompass "eastern Puget Sound"—that the Court found is barred by the doctrine of laches, because the claim arose, at the latest, in 1990. Order, p. 6.

The Tulalip also argue that the doctrine of laches is generally inapplicable in these proceedings. The Ninth Circuit Court of Appeals has indeed held that the doctrine of laches does not apply to "defeat Indian treaty rights." *U.S. v. Washington,* 157 F.3d 630, 649 (9th Cir.1998). That rule does not apply here; Tulalip has asserted no treaty right which has been defeated by the application of laches. Instead, Tulalip has advanced a claim that the Suquamish have been fishing or attempting to fish outside the boundaries of their U & A, described by Judge Boldt as "the marine waters of Puget Sound". The claim arises from a dispute over the Court's prior language, not from a treaty right.

The Tulalip point to prior language in this case stating that "equitable defenses are not available in the determination of usual and accustomed fishing places." Order of February 15, 1990 (Dkt. # 11596). However, this Request for Determination does not, and cannot, involve a determination of the Suquamish U & A; that has already been determined. Judge Coyle's language regarding equitable defenses is therefore inapplicable to this subproceeding.

---

1. Although this case has been divided into "subproceedings" for the purpose of management of individual disputes among the parties, the subproceedings are all part of the original case, C70–9213, brought under the Court's continuing jurisdiction in this matter.

Next, the Tulalip assert that res judicata should not apply to preclude this Request. They contend that a request for clarification of a U & A is substantively different from a request for determination of a U & A, and is not barred by the Court's earlier rulings on the Suquamish and Tulalip U & A's. The Court finds no basis for reconsideration in that argument. The Tulalip asserted in their Request for Determination that the Court has jurisdiction under Paragraphs 25(a)(4), (a)(6), and (a)(7) to "clarify ambiguities and interpret, define and identify the geographic scope" of each Tribe's U & A. However, the Ninth Circuit Court of Appeals has rejected those bases for the Court's jurisdiction in this type of dispute, ruling instead that a request to clarify Judge Boldt's language must proceed under Paragraph 25(a)(1), which vests continuing jurisdiction to determine "whether or not the actions ... by any party ... are in conformity with [Decision I] of this injunction." *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1360 (9th Cir.1998).[2] A request under Paragraph 25(a)(6) is barred by res judicata because the Suquamish U & A has been specifically determined.

Res judicata applies to "any claims that were raised or could have been raised in the prior action". *Owens v. Kaiser Foundation Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir.2001). Having themselves originally asserted a claim to "all marine waters of Puget Sound and of the Strait of Juan de Fuca" as their own U & A,[3] the Tulalip Tribes should reasonably have expected the Suquamish to have the same broad view of the term "marine waters of Puget Sound," so as to encompass saltwater areas to the east of Whidbey Island. Despite their broad claim, the Tulalip Tribes' U & A was subsequently narrowed by the Court, following a series of settlement agreements with various Tribes. *United States v. Washington*, 626 F.Supp. 1405, 1527–1532 (W.D.Wash.1985). These settlement agreements were negotiated among various Tribes, including the two here, to resolve their objections regarding the Tulalip Tribes' U & A. *Id.* at 1471–1482. Any claim by the Tulalip Tribes that the Suquamish U & A in the marine waters of Puget Sound did not include areas to the east of Whidbey Island, overlapping their own U & A, could and should have been put to rest, as between these two parties, in the 1983 settlement. Should the Suquamish now be violating the terms of that agreement, the settlement itself provides for resolution of disputes arising under or relating to its terms within the Court's continuing jurisdiction in this case. *Id.* at 1478. However, the Tulalip have neither pled nor asked for enforcement of the settlement agreement, and their attempt to bring claims regarding the Suquamish U & A apart from that settlement threatens the integrity of that carefully crafted agreement. The Court declines to view this Request to "clarify" the Suquamish U & A as a completely separate matter.

As the Tulalip have not demonstrated manifest error in the Order of dismissal,

---

**2.** The Suquamish asserted this defect in pleading jurisdiction in their motion to dismiss. In the previous Order, the Court noted that this subproceeding is subject to dismissal because it differs in significant ways from subproceeding 05–03, in which Paragraph 25(a)(1) was asserted as a basis for jurisdiction. However, the Court did not actually address the jurisdictional argument, because it could easily be cured by amendment. Instead, the Court found sufficient basis for dismissal on the grounds of res judicata and laches.

**3.** *U.S. v. Washington*, 459 F.Supp. 1020, 1058 (W.D.Wash.1978).

the motion for reconsideration is DE-NIED.

## ORDER ON MOTION FOR RECONSIDERATION

### Subproceeding No. 05–3

### (March 17, 2006)

This matter is before the Court for consideration of the motion for Upper Skagit Indian Tribe's motion for reconsideration of this Court's Order on Motion to Compel (Dkt. # 71, 73). The Court directed the Suquamish Tribe to respond to the motion, and the Tribe has done so. Although the Upper Skagit argues in reply that the Suquamish response does not address the issues, the Court finds otherwise.[1] Identification of relevant documents can be done in response to an interrogatory as suggested by the Suquamish Tribe. Accordingly, the motion for reconsideration is DE-NIED.

## ORDER ON MOTION FOR CLARIFICATION

### Subproceeding No. 05–3

### (March 17, 2006)

This matter is before the Court for consideration of the motion of the Port Gamble and Jamestown S'Klallam Tribes for clarification as to the scope of this subproceeding. They ask that it be limited to the issues raised in the original Request for determination in this matter, together with the Cross–Request for Determination. The Nisqually Indian Tribe and Swinomish Indian Tribal Community have joined in the motion, and the Upper Skagit Indian Tribe and the Suquamish Tribe have stated no objections to it. The Tulalip Tribe asserts that each Tribe should be able to determine its own level of participation in this matter. The Lummi Nation opposes both the motion and the standing of the two S'Klallam Tribes to bring this motion.

The concept of standing is difficult to apply in this case, in which a great many parties' interests are at stake. The fear of the S'Klallam, Nisqually and Swinomish Tribes that this subproceeding could expand to create a global definition of "Puget Sound," applicable to all Tribes' usual and accustomed fishing areas (U & A) is well-founded. Such expansion is not appropriate and shall not be allowed.

Accordingly, the motion for clarification is GRANTED. This subproceeding is limited in scope to a determination as to whether the U & A of the Suquamish Tribe, as described by Judge Boldt, includes the subproceeding areas in Saratoga Passage and Skagit Bay, as set forth in the Request and Cross–Request for Determination. This subproceeding will not define the term "Puget Sound" as used by Judge Boldt in describing any other U & A, nor for any purpose other than to resolve the issues between the requesting and responding Tribes named in this subproceeding. As to the subproceeding area, however, the Court's determination as to whether that area is included in the Suquamish Tribe's U & A shall be binding on all Tribes.

## ORDER ON MOTION FOR A PROTECTIVE ORDER

### Subproceeding No. 01–2

### (August 15, 2006)

This matter is before the Court for consideration of the Samish Indian Nation's ("Samish") second motion for a protective

---

1. The Court notes that the upper Skagit reply brief is not signed as required by the Court's electronic filing procedures. The reply has nevertheless been considered.

order (Dkt. # 187). This motion has been opposed by the United States of America ("United States") and by the Lummi Nation ("Lummi"), the Swinomish Indian Tribal Community ("Swinomish"), the Upper Skagit Indian Tribe ("Upper Skagit"), the Tulalip Tribes ("Tulalip"), and the Port Gamble and Jamestown S'Klallam Tribes "(S'Klallam") (together, the "Treaty Tribes"). For the reasons stated below, the motion shall be denied.

## DISCUSSION

■ This motion concerns two memos written by counsel for the Samish: one dated July 17, 1998 and addressed to the Samish Tribal Council, and one dated October 26, 1999 and addressed to Vernon Peterson, then Assistant Regional Solicitor for the United States. Copies of these memos were provided by Samish counsel to the United States to support the Samish request that the United States either provide representation for the Samish in these proceedings, or provide federal funds to hire an attorney. 25 C.F.R. § 89.40, 43. Pursuant to these regulations, a tribe requesting such assistance must provide background information to explain why the claim it wishes to assert in litigation has merit. *Id.*

By letter dated September 20, 1999, Mr. Peterson, Assistant Regional Counsel, stated to counsel for the Samish,

> I would like to take you up on your offer to provide additional information.... I recognize that you may not want to share confidential attorney work product. If the memorandum is confidential I would not be able to assure you it would be protected from release under the Freedom of Information Act or pursuant to discovery in *U.S. v. Washington,* if you did provide me a copy. However, understanding your views regarding the legal basis or

bases for seeking relief from judgment under Rule 60(b) would be very helpful to our office in providing legal advice to the Assistant Secretary on the issues raised in the Tribe's letter.

Declaration of Craig Dorsey, Exhibit B. Counsel states that "I informed my client [the Samish] that "disclosure of the documents could potentially waive attorney client privileges, but that we would claim the privilege. My client believed the issue important enough to risk waiving the privilege." Declaration of Craig Dorsey, ¶ 4. Subsequently, the United States declined to provide representation for the Samish in this matter. *Id.,* ¶ 5.

During discovery in this subproceeding, the United States produced copies of these two documents to the Samish in response to a discovery request. These discovery responses, including copies of the two documents, were also provided to other parties in this subproceeding. The Samish now assert that these documents are protected by attorney-client privilege; they ask that all outstanding copies by returned to them, and that the adverse parties be foreclosed from using these documents in this subproceeding or any other. Both the United States and the Treaty Tribes oppose this request.

Counsel for the Samish contends that the privilege was asserted when the documents were provided to the United States, and that he and Mr. Peterson reached a verbal agreement which was "memorialized" in Mr. Peterson's September 20, 1999, letter. Declaration of Craig Dorsey, Exhibit C. However, there is no evidence in the record that the privilege was ever asserted in writing. Further, the language of the September 20 letter does not reflect any understanding or agreement, but rather advises counsel that confidentiality cannot be assured, specifically referencing discovery in this case as well as the

Freedom of Information Act. Counsel also acknowledges that the Samish assumed the risk of waiving attorney-client privilege, believing that the possible benefit of litigation funds made that worthwhile.

It is not necessary for the Court to determine whether these two documents are actually subject to attorney-client privilege,[1] because the Court finds that any attorney-client privilege that attached to the documents was waived by their disclosure to the United States. The Samish argue that this would be an unfair result, given that the United States has now aligned itself with the Treaty Tribes. However, the Court notes that under the cited regulation it was not necessary for the Samish to provide these actual documents in requesting litigation funds; all that is required is "a detailed statement describing the nature and scope of the problems for which legal services are sought," as well as a detailed financial statement. 25 C.F.R. § 89.43(a). By providing the actual documents, after being advised by the United States that it could not assure they would be protected from discovery, the Samish waived any attorney-client privilege that existed as to these two documents.

The motion for a protective order is accordingly DENIED.

## ORDER ON MOTION TO COMPEL

### Subproceeding No. 01–2

### (August 15, 2006)

This matter is before the Court for consideration of a motion to compel by the Samish Indian Nation ("Samish"). Dkt. # 223. The Samish seek to compel the Swinomish Indian Tribal Community ("Swinomish") and Lummi Nation ("Lummi") to produce certain documents generated during settlement proceedings. The Swinomish and Lummi have opposed the motion. The relevant facts are known to the parties and need not be reviewed here. For the reasons set forth below, the motion shall be granted.

### DISCUSSION

■ In response to a Samish discovery request, the Lummi and Swinomish produced copies of a settlement agreement between them, dated June 15, 1998. This settlement agreement, which among other matters resolved issues between these two tribes regarding their rights as successors to the aboriginal Samish, was not approved by the Court nor filed in *U.S. v. Washington*. After receiving a copy of the settlement agreement, the Samish argued that they were entitled to discovery of the documents relevant to the formation of this settlement agreement. The Lummi and Swinomish asserted that any documents that evidence communications leading to the formation of the settlement agreement are "privileged" pursuant to Federal Rule of Evidence 408, and accordingly provided a privilege log of the documents. Declaration of Craig Dorsey, Exhibit 6, 7. The Samish contend in this motion that the documents themselves should be provided.

Rule 408 states that evidence related to a settlement agreement

is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise

---

**1.** Counsel for the Samish himself described the attorney-client privilege status of these two documents as "uncertain" in an April 28, 2006 letter to counsel for the Treaty Tribes. Declaration of Craig Dorsey, Exhibit A.

negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Fed. R.Evid. 408. The Samish argue that they are entitled to these documents because their purpose does not go to the liability of the settling parties, but rather to their motive in reaching the settlement, and their conduct in the earlier proceedings in this litigation. The Samish contend that these matters are relevant to the equitable considerations at issue in this sub-proceeding.

The Lummi and Swinomish, in response, contend that their conduct in reaching the settlement agreement is not relevant to the equitable considerations at issue in these Rule 60(b) proceedings. They contend that the issue in a Rule 60(b) motion is whether the moving party (here, the Samish) acted equitably, not whether they did. They also argue that the real purpose of the Samish motion is to force the Lummi and the Swinomish to relitigate the issue of succession from the treaty-time Samish, a matter already decided by this Court. Finally, they contend that Samish is trying to "poison the well" by implying there was a "nefarious scheme" by the other tribes to deprive the Samish their due.

The Court finds that the documents sought here fall under the Fed.R.Evid. 408 exceptions, in that they may be relevant to the undue delay which is at issue here. The Court declines to adopt the argument of the Lummi and Swinomish that only the conduct of the moving party may be considered in this Rule 60(b) proceeding. Rule 60(b)(6) relief is an extraordinary remedy, which will not be granted "unless the moving party is able to show both

injury and that circumstances beyond its control prevented timely action to protect its interests." *U.S. v. Alpine Land & Reservoir, Co.,* 984 F.2d 1047, 1049 (9th Cir.); *cert. denied,* 510 U.S. 813, 114 S.Ct. 60, 126 L.Ed.2d 29 (1993). The conduct of other parties may be part of those circumstances beyond the control of the Samish. As the documents here may be relevant to those circumstances, the Samish are entitled to discovery. Their use will be limited, by Court Order if necessary, to purposes which are permissible under Rule 408.

The Samish motion to compel is accordingly GRANTED. The disputed documents shall be provided to the Samish within one week of the date of this Order.

## ORDER ON PENDING MOTIONS TO STRIKE EXPERT WITNESSES

### Subproceeding No. 05–3

### (October 10, 2006)

This matter is before the Court for consideration of motions by the opposing parties to strike each others' expert witnesses. The Court finds merit in both motions, and for the reasons set forth below, now grants both motions.

(1) Motion to. Strike Barbara Lane, Ph.D. as an Expert Witness (Dkt. # 118).

The Suquamish Tribe ("Suquamish") has moved to strike Barbara Lane, Ph.D., as an expert witness for the Upper Skagit Tribe ("Upper Skagit"). Dr. Lane is an anthropologist whose report on historical tribal fishing grounds was a major item of evidence considered by Judge Boldt in *U.S. v. Washington,* 384 F.Supp. 312 (W.D.Wash.1974) (*"Washington I "*). The Upper Skagit has identified her as an expert witness in this subproceeding, stating that she is "uniquely qualified to express

an opinion about Judge Boldt's intent in connection with his use of the phrase 'the marine waters of Puget Sound'" in the context of the this case. Upper Skagit's Opposition, p. 2. However, this Court has already ruled, in accordance with *Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355 (9th Cir.1998) ("*Muckleshoot I*"), that Dr. Lane may not offer latter-day testimony regarding the evidence that was before Judge Boldt when he rendered his decision in 1974. Dkt. # 43. Although Dr. Lane's assistance was of enormous value to the Court, the record now speaks for itself, and Dr. Lane may not offer her opinion as to what she believes Judge Boldt intended.

The Suquamish motion to strike the expert testimony of Dr. Barbara Lane is accordingly GRANTED.

(2) <u>Motion to Strike Roger Shuy, Ph.D., as an Expert Witness</u> (Dkt. # 122).

The Swinomish Indian Tribal Community ("Swinomish"), joined by the Upper Skagit, have moved to strike Roger Shuy, Ph.D., as an expert witness for the Suquamish. Dr. Shuy is a professor of linguistics (emeritus), who proposes to apply the linguistic tools of semantics, discourse analysis, lexicography, and syntax to assist the Court in determining that Judge Boldt's use of the term "Puget Sound" was not ambiguous. The Suquamish argue that this testimony meets all the requirements of Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In response, the Swinomish and Upper Skagit assert that regardless of reliability, this testimony is beyond the scope of this Court's order relating to testimony beyond the record.

This Court, citing to *Muckleshoot I*, earlier defined the scope of the relevant evidence in this proceeding. At the first step,

the determination as to whether Judge Boldt's language was ambiguous, the relevant evidence is that "which indicates the contemporary understanding of the extent of 'the marine waters of Puget Sound ...' which will 'shed light on the understanding that Judge Boldt had of the geography at the time.'" Dkt. # 71, p. 4; quoting *Muckleshoot I*, 141 F.3d at 1360; and *Muckleshoot Indian Tribe v. Lummi Indian Nation*, 234 F.3d 1099, 1100 (9th Cir. 2000) ("*Muckleshoot II*"). Should the evidence show that the areas disputed here are within the geographic reach of Puget Sound as that term was commonly understood in 1974, the requesting parties must then produce evidence that Judge Boldt intended some other meaning when he wrote Finding of Fact 5. *Id.* "The evidence that is relevant to Judge Boldt's intent comprises 'the entire record before the issuing court and the findings of fact [which] may be referenced in determining what was decided.'" *Id.*, quoting *Muckleshoot I*, 141 F.3d at 1359.

Nowhere was it contemplated that linguistic analysis would be relevant to the determination of ambiguity or intent in Judge Boldt's language. The motion of the Swinomish and Upper Skagit to strike the expert testimony of Dr. Roger Shuy is accordingly GRANTED.

ORDER ON MOTION TO DISMISS

Subproceeding No. 05–2

(November 21, 2006)

This matter is before the Court for consideration of a motion to dismiss filed by the Port Gamble and Jamestown S'Klallam Tribes ("S'Klallam"). Dkt. # 57. The Skokomish Indian Tribe ("Skokomish"), joined by the Lower Elwha Klallam Tribe ("Lower Elwha"), has opposed the motion. Oral argument was heard on November 7, 2006, and the matter is now ripe for deci-

sion. For the reasons which follow, the Court shall grant the S'Klallam motion and dismiss this Subproceeding.

## BACKGROUND AND DISCUSSION

The S'Klallam Tribes initiated this case by filing a Request for Determination in January 2005, which was opened as subproceeding 05–01. The Request sought a determination that the Skokomish Tribe may not "open or conduct . . . [a]ny fishery in Hood Canal . . . in violation of the Hood Canal Agreement." They also requested a determination that the Skokomish may not conduct

> Any action such as the promulgation of any Fisheries Management Plan or Quota based allocation, or any other action controlling the harvest of fish and shellfish in Hood Canal . . . without Plaintiff's "express consent" by "Compact or otherwise" as required in the above Hood Canal Agreement.[1]

Request for Determination ("Request"), p. 1–2. The Skokomish filed an answer and a Counter–Request for Determination, which was bifurcated on the Court's motion from Subproceeding 05–01, and opened as Subproceeding 05–02. The Skokomish then filed an amended Request for Determination in this Subproceeding, asking that "the Court determine and declare an equitable treaty fishing harvest allocation for the available harvest of all species of finfish and shellfish in Hood Canal." Dkt. # 55. The S'Klallam have moved to dismiss, asserting that the Court does not have jurisdiction to allocate the fisheries resources among the tribes. They also advance arguments based on res judicata and standing. The Court finds reason to dismiss on both jurisdictional and res judicata grounds, and need not reach the standing argument.

## I. Subject Matter Jurisdiction

The Court retained jurisdiction in this matter for certain specified purposes, set forth in Paragraph 25 of the Permanent Injunction. *U.S. v. Washington*, 384 F.Supp. 312, 419 (W.D.Wash.1974). The Skokomish allege jurisdiction in this Subproceeding under three separate sections of Paragraph 25, as amended by Court

---

1. The Hood Canal Agreement between the Skokomish and three S'Klallam Tribes was signed in 1982 and adopted by the Court in 1983. *United States v. Washington*, 626 F.Supp. 1405, 1468–9 (W.D.Wash.1985). In the Agreement, the other signatory tribes recognized the Skokomish Tribe's primary right to fish in Hood Canal. In exchange, the Skokomish agreed that

 > it will not, under any condition or for any reason whatsoever, exercise or seek to exercise its primary right on Hood Canal north of Ayock Point . . . against any of the other stipulating parties without its or their express consent.

 626 F.Supp. at 1469. Subsequently, in 1984, the Court issued a judicial determination of the primary right of the Skokomish in Hood Canal. The Court ruled that

 > No tribe or member of a tribe shall exercise treaty fishing rights within the area of Hood Canal or on rivers or streams draining into Hood Canal subject to the primary right of the Skokomish Indian Tribe without the prior express consent of the Skokomish Indian Tribe or as otherwise provided by the Hood Canal Agreement . . . and Order of March 8, 1983.

 *Id.* at 1487. The Court noted in its Conclusions of Law that the Agreement

 > contains the consent of the Skokomish Indian Tribe to fishing within certain parts of its territory, or primary right area, by members of the named Klallam bands, subject to conditions stated therein. That stipulation and order shall continue to govern treaty fishing by members of the Klallam bands in the areas described in it.

 *Id.* at 1491. Thus, the Court's Order determining the primary right of the Skokomish maintained the force and effect of the Hood Canal Agreement on that primary right. This ruling was affirmed by the Ninth Circuit. *U.S. et al. v. Skokomish*, 764 F.2d 670 (9th Cir.1985).

Order dated August 23, 1993. Paragraph 25 states, in relevant part,

(a) The parties or any of them may invoke the continuing jurisdiction of this court in order to determine:

(1) Whether or not the actions intended or effected by any party (including the party seeking a determination) are in conformity with Final Decision # 1 or this injunction;

. . . .

(4) Disputes concerning the subject matter of this case which the parties have been unable to resolve among themselves;

... and

(7) Such other matters as the court may deem appropriate.

C70–9213, Dkt. # 13599. The Skokomish have invoked this Court's jurisdiction under these three sections.

In moving to dismiss, the S'Klallam have only addressed the Skokomish Request under sections (4) and (7). These arguments shall be addressed first.

The S'Klallam assert that section (4) is inapplicable to confer jurisdiction because the parties have settled their dispute, with finality, through the Hood Canal Agreement. The dispute here does not arise from the Hood Canal Agreement, and it cannot be settled by looking to its terms. Instead, the Skokomish are asking the Court to bypass the Agreement and create an allocation for the parties because they cannot agree among themselves as required by the Agreement.

The Skokomish, in response, contend that the Court's power arises from the language in the Hood Canal Agreement stating that

north of Ayock Point on Hood Canal the Skokomish and the Klallam Bands may exercise their respective treaty fishing rights without any limitation or control whatsoever by any of the stipulating parties, except as the stipulating parties may mutually agree by compact **or otherwise.**

*U.S. v. Washington,* 626 F.Supp. at 1469.

The Skokomish argue that the "or otherwise" language suggests that if the parties cannot reach an agreement they can "take advantage of any other remedy, including the Court's continuing jurisdiction over this case." Opposition to Motion to Dismiss, p. 8. That is not merely a strained reading of the language, it is incorrect. The term "or otherwise" clearly refers to a manner in which the parties may agree— "by compact or otherwise." But come to agreement they must. Neither this section nor any other provision in the Hood Canal Agreement empowers the Court to allocate harvest shares in the absence of the agreement of the parties. Thus, while this Court may interpret and enforce the Agreement, as indeed it did in Subproceeding 05–01, it cannot take action which would be contrary to it. Forcing an allocation of harvest shares upon the other tribes, in the absence of their consent, would be contrary to the Agreement.

The Skokomish also contend that the Court has jurisdiction under Paragraph 25, section (4) to resolve disputes which the parties are unable to resolve themselves. However, the Court's power under this section extends only to "disputes concerning the subject matter of this case" which the parties have been unable to resolve. The subject matter of this case is treaty fishing rights, not the equitable rights of any one tribe to harvest a certain allocation of fish. Thus, a dispute over the exercise of a tribe's primary rights would fall under the Court's jurisdiction. But this dispute is not over the primary right of the Skokomish. Both that primary right, and the exercise of that primary

right, were addressed in prior orders of *U.S. v. Washington* and the Hood Canal Agreement, and those decisions are res judicata. Nowhere in these decisions is there a finding that inter-tribal allocation (as opposed to allocation between treaty- and non-treaty fishermen) is the subject matter of this case.

The Skokomish assert that this Court "has accepted jurisdiction to hear all prior disputes concerning some aspect of inter-tribal allocation. *See, e.g.*, Subproceeding Nos. 83–3, 83–9, 86–5, 86–8, 86–10, 87–2, 87–4, 88–2, 89–2, 91–1, and 96–1 . . . ." Opposition to Motion to Dismiss, p. 11. This statement is not supported by citation to any specific prior language of the Court. The parties were asked prior to oral argument to provide specific citations, by docket number, to Orders filed in other Subproceedings to which they would make reference or upon which they would rely. Only one document from the quoted list of Subproceedings was provided, namely a declaration from 86–5, to which was attached the referenced South Puget Sound Region of Origin Treaty Salmon Allocation Agreement. C70–9213, Dkt. # 14804. This document does not support the Skokomish assertion that the Court has accepted jurisdiction to hear allocation disputes. Instead, it demonstrates that the tribes negotiated among themselves and arrived at an allocation by agreement.

The Skokomish also quoted in their opposition from an Order filed in Subproceeding 91–1 ("Halibut Subproceeding"), establishing an interim management plan for the halibut fishery. C70–9213, Dkt. # 17112. Again, in that Subproceeding, the Court did not actually allocate the halibut harvest, but chose among several management plans proposed by different tribes. Most importantly, the Court specifically noted that "the instant parties **have consented to the authority of this**

**court** to enter an order adopting an FMP [Fisheries Management Plan] for the 2001 halibut fishery." C70–9231, Dkt. # 17112, p. 5 (emphasis added). Such consent is lacking in this Subproceeding: the S'Klallam do not consent to have the Court craft a management plan or harvest allocation for the Hood Canal fishery. Absent that consent, the Court does not have jurisdiction under Paragraph 25(a)(4) to do so.

The Skokomish also contend that the Court has jurisdiction to determine an allocation under section (7) of Paragraph 25, which is reserved for "such other matters as the court may deem appropriate." This is a discretionary section, and in light of the considerations set forth elsewhere in this opinion, the Court does not deem it appropriate to take jurisdiction of this matter.

Finally, the Skokomish argue that nowhere did the S'Klallam oppose jurisdiction under section (1) of Paragraph 25, and that therefore this point is conceded. However, the Court may consider matters of its jurisdiction on its own motion, regardless whether a party addresses it. Under section (1) of Paragraph 25, the Court retains jurisdiction to consider "[w]hether or not the actions intended or effected by any party (including the party seeking a determination) are in conformity with Final Decision # 1 or this injunction." C70–9213, Dkt. # 13599. Nowhere have the Skokomish identified how this Subproceeding concerns an "action" by any party which is, or is not, in conformity with the final decision. Instead, they are asking the Court to take an action—one that is not in conformity with the final decision, for the reasons set forth above.

Under their section (1) argument, the Skokomish assert that "[t]he Court has been clear since the late 1970's that jurisdiction concerning '[r]egulation and harvest control over the fish allocated to trea-

ty fisherman [sic] ... shall remain with the court.'" Response at 7, citing *U.S. v. Washington,* 459 F.Supp. 1020, 1103 (1978). That language was lifted from the Memorandum Order and Preliminary Injunction re: Allocation of 1977 Salmon Runs and Other Matters, dated September 28, 1977. The "allocation" in this order refers to allocation of salmon between treaty- and non-treaty fisherman, not allocation among tribes. The cited paragraph further required that "[t]ribal regulations governing such fishery shall be adopted and filed with the court in strict conformance with final Decision # 1 and subsequent orders of this court." *Id.* This language simply requires that the tribes adopt their own fishing regulations in conformity with Final Decision # 1; it does not supercede the jurisdictional limitations set forth in Paragraph 25 of the permanent injunction.

In summary, the Court has retained jurisdiction in this case for the specific purposes set forth in Paragraph 25, and no other. The request for allocation of the treaty harvest as a form of equitable relief does not fall within any of the purposes set forth therein. Fishing in the Hood Canal is governed by the Hood Canal Agreement, which does not provide for Court intervention should the parties fail to agree on management. The resulting "race fishery," should it come to that, may be undesirable in the eyes of some, but the Hood Canal Agreement does not address any other alternative should the parties to that Agreement fail to agree on harvest quotas.[2]

## II. Res Judicata

■ As the S'Klallam so ably argued at oral argument, the Hood Canal Agreement is res judicata as between the parties here. All the necessary elements for application of res judicata have been met: rights or interests established in the Agreement would be eroded or impaired by Court intervention in the Hood Canal fishery; the same evidence is relevant to both the prior actions and this one; the same rights are at issue; and both the prior determinations (those culminating in the Hood Canal Agreement) and this Subproceeding arise from the same transactional nucleus of facts. *Costantini v. Trans World Airlines,* 681 F.2d 1199, 1201 (9th Cir.1982).

## CONCLUSION

The court finds, as set forth above, that it does not have jurisdiction under Paragraph 25 of the Permanent Injunction to grant the relief requested here. The rights and obligations of the parties here have been conclusively set forth in the Hood Canal Agreement, which itself does not empower the Court to allocate fisheries resources among the tribes fishing in Hood Canal. In the Agreement, the Skokomish specifically agreed that they would not, "under any condition or for any reason whatsoever, exercise or seek to exercise its primary right on Hood Canal north of Ayock Point ... against any of the other stipulating parties without its or their express consent." *U.S. v. Washington,* 626 F.Supp. at 1469. The Skokomish benefitted from the Agreement in that it resulted in the recognition of their primary right in Hood Canal, and they may not now avoid that Agreement or any provision thereof. Nor may they ask the Court to intervene

---

**2.** The Lower Elwha argued, in opposition to dismissal, that a race fishery in Hood Canal would result in destruction of the resource through a "tragedy of the commons". This cannot occur, however, because the total combined harvest of each species by all the Tribes is limited by state fisheries regulations which are not at issue here.

in the name of "equity" and take action which they themselves cannot.

Accordingly, the S'Klallam motion to dismiss for lack of jurisdiction is GRANTED and this Subproceeding is DISMISSED.

## ORDER ON PENDING MOTIONS

Subproceeding No. 05–3

(December 4, 2006)

This matter is before the Court for consideration of several motions which the Court deems appropriate for a ruling prior to the December 12, 2006 oral argument: the Suquamish motion to dismiss the Tulalip Tribes as a party to this action (Dkt. # 152), and several Tribes' motions to strike certain portions of one Suquamish reply brief, Dkt. # 175 (Dkt. ## 181, 182, 184). The Court finds it unnecessary to direct a response to the motions to strike. Having considered the motions and the responsive memoranda, the Court now finds and rules as follows:

### (1) Suquamish Motion to Dismiss Tulalip as a Party to this Subproceeding

The Suquamish have moved to dismiss the Tulalip Tribes from this subproceeding, contending that their issues were already litigated in the dismissed subproceeding C05–04, and that participation here allows them a "third bite at the apple." The Court ruled in C05–04 that issues between the Tulalip and Suquamish Tribes had been conclusively resolved in prior proceedings, including a settlement, and that those prior decisions, including a settlement, would not be re-visited. That ruling does not mean that the Tulalip Tribes, as a party to this case, may not participate in this subproceeding. It was the claims raised in C05–04 that were subject to dismissal, not the Tulalip Tribes themselves. The Court can find no authority, even in Rule 21 as argued by the Suquamish, for dismissing a party to this case from any individual subproceeding.

The Suquamish motion to dismiss the Tulalip Tribes from this subproceeding is accordingly DENIED.

### (2) Motions to Strike

The Port Gamble and Jamestown S'Klallam Tribes, the Tulalip Tribes, and the Upper Skagit Indian Tribe have all filed surreplies to one Suquamish reply, in which Suquamish invited the Court to expand the scope of this subproceeding to include the western boundary of the Suquamish U & A.[1] Two of the surreplies were designated as motions to strike specific portions of the Suquamish reply in which the Suquamish discussed this option. The Court finds it unnecessary to strike those portions of the reply, but also declines to expand the subproceeding as suggested. The scope of this subproceeding remains as stated in the prior Order on clarification:

This subproceeding is limited in scope to a determination as to whether the U & A of the Suquamish Tribe, as described by Judge Boldt, includes the subproceeding areas in Saratoga Passage and Skagit Bay, as set forth in the Request and Cross–Request for Determination. This subproceeding will not define the term "Puget Sound" as used by Judge

---

1. The Lower Elwha Klallam Tribe also objected to the Suquamish suggestion to expand the scope of this subproceeding, in a filing designated as "joinder in opposition to motion for summary judgment" (Dkt. # 186). As opposition to the Suquamish motion for summary judgment, this filing is untimely. However, the substance of the argument presented relates to the Suquamish request to expand this subproceeding. The Court has therefore considered this document as a joinder in the three surreplies.

Boldt in describing any other U & A, nor for any purpose other than to resolve the issues between the requesting and responding Tribes named in this subproceeding.

Dkt. # 95, p. 2.

The Court notes the Suquamish argument that "[t]o properly define 'Puget Sound' in the context of this litigation, the Court must identify the geographic extent of 'Puget Sound' as it relates to Suquamish's determination. This determination necessarily includes all exterior boundaries of 'Puget Sound'." Suquamish Reply, Dkt. # 175, p. 2. This argument misapprehends the scope of this subproceeding, which is to determine whether Saratoga Passage and Skagit Bay lie within the area described as the "marine waters of Puget Sound" from the northern tip of Vashon Island to the mouth of the Fraser River. The western limits of the Suquamish U & A are not at issue in this subproceeding, and need not be determined in order to reach a decision on the eastern limits in the area at issue here. While the Suquamish protest that so limiting this subproceeding may leave them open to multiple litigation, that fear is purely speculative. To whatever extent there may be a dispute involving the Strait of Juan de Fuca or other areas to the west, that dispute has not been properly brought before the Court, and will not be considered in this subproceeding. Nor will the Court attempt to arrive at a global definition of the term "Puget Sound," or determine the geographical extent of "Puget Sound," except as necessary to decide whether the subproceeding area is within the area described by Judge Boldt.

The motions to strike are accordingly DENIED as moot.